[No. A066290. First Dist., Div. Two. Feb. 7, 1996.]

FRANK T. LINNEY, Plaintiff and Appellant, v.
LOUIS A. TURPEN et al., Defendants and Respondents.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III B, III C and III D.

## Counsel

Clisham & Sortor, David P. Clisham and Daniel S. Connolly for Plaintiff and Appellant.

Louise H. Renne, City Attorney, Diane L. Hermann, Deputy City Attorney, Mara E. Rosales, Hanson, Bridgett, Marcus, Vlahos & Rudy and Jacquelyn J. Garman for Defendants and Respondents.

## Opinion

### HAERLE, J.—

#### I. Introduction

Appellant Frank T. Linney, a San Francisco Airport police officer, was suspended for six months because he lied to a superior officer during a 1989 investigation concerning a lost bracelet. Appellant filed a petition in the superior court for writ of mandate to compel his employer (employer or respondents)[1] to set aside the discipline. Judgment was for respondents, including costs. Appellant contends that (a) the manner in which the hearing officer was selected deprived him of due process, (b) the hearing officer committed prejudicial error in exclusion of evidence, (c) the discipline imposed was excessive and constituted an abuse of discretion, (d) and the trial court erred in awarding costs to respondents. We affirm.

---

[1] Named as respondents were: Louis A. Turpen, director of airports; San Francisco International Airports Commission; Dave Wharton III, hearing officer; Ronald C. Driscoll, Chief of Police, San Francisco Airport; San Francisco Civil Service Commission; and the City and County of San Francisco.

## II. PROCEDURAL AND FACTUAL BACKGROUND

Appellant began working for the City and County of San Francisco (City) as an airport vehicular traffic control officer in early 1981, and became permanent in late 1982. The facts which gave rise to the disciplinary action, as found by the hearing officer, are not in dispute. On Friday April 28, 1989, a United Airlines baggage mechanic, Brian Underhill, found a valuable bracelet, reportedly worth about $14,000, in the public roadway in front of one of the airport terminals. Underhill brought the bracelet to the attention of Traffic Control Officer Valver and Underhill's friend at the Avis counter, Donna Branston. After some discussion of the value and appropriate handling of the bracelet, Underhill turned it over to Branston, with the understanding that she would turn it in to the airport lost and found when she returned to work on Monday, May 1.

In the late evening hours of Saturday, April 29, appellant was assigned to investigate and prepare a written report concerning the lost bracelet. Appellant spoke with Underhill on the telephone shortly after midnight on Sunday, April 30. Underhill revealed that the bracelet had been in his possession. He said he had given it to a friend and that she would turn it in on Monday.

A few minutes after appellant had the conversation with Underhill, appellant's superior officer on duty, Lieutenant James Lynch, asked appellant about the status of his investigation. Appellant reported to Lynch that the bracelet was secure in Underhill's toolbox at the airport. Underhill testified he did not have a toolbox and had not said anything about a toolbox to appellant. It was this statement made by appellant to his superior officer which the employer believed constituted a lie warranting appellant's termination.

On Monday, May 1, Branston turned the bracelet in to the airport lost and found, but a review of the handling of the incident continued. Appellant's written report stated nothing about the bracelet's whereabouts. Sergeant Reilly prepared a crime report (theft of found property), again with no mention of the whereabouts of the bracelet. Lieutenant Lynch reported that appellant had given him inconsistent information and had told him the toolbox story. Lynch's report described a meeting with appellant in which appellant spontaneously stated, "I fucked up, I should have told you everything."

On August 10, 1989, Deputy Chief of Police James C. Gibbs gave appellant notice of his intention to recommend dismissal for cause. On September 19, 1989, respondent Turpen, director of airports, notified appellant that he was recommending dismissal for cause, based on his review of

the transcript of a show cause hearing held on August 30. The dismissal charges were brought on the ground that appellant lied to his superior officer in the course of carrying out his duties, thereby violating the following rules of conduct set forth in the airport police manual, and chief's order No. 85-11:

*Airport Police Manual Section 7150.41/Personal Integrity.* "Consistent with the 'Law Enforcement Code of Ethics' is the commitment to honesty and integrity. Airport Police Members shall remain above reproach and shall avoid any conduct which might compromise the integrity of themselves or fellow Members. The dishonesty of a single Member is enough that it may impair public confidence and cast suspicion upon, not only the Airport Police but, the entire law enforcement profession."

*Section 7310.20/Truthfulness.* "Members are required to be truthful at all times, whether or not under oath."

*Section 7380.47/Assisting Suspects and Criminals.* "Members shall not communicate in any manner, directly or indirectly, any information which might assist persons guilty of criminal or quasi-criminal acts to escape arrest or punishment, or which may enable them to dispose of any evidence or unlawful activity or money, merchandise, or property unlawfully obtained."

*Chief's Order #85-11/Professional Integrity.* "As a professional Police Department the integrity of our members must be considered impeccable if we are to effectively realize our responsibility. Recent court decisions have consistently held Peace Officers to a higher standard of conduct and personal rectitude. Any compromise of any Officer's honesty or truthfulness renders that Officer useless to law enforcement as the Officer's credibility will most certainly be challenged. [¶] Honesty and truthfulness shall be strictly adhered to. Termination will be the first consideration in the disciplinary process of any compromise of honesty or truthfulness. First offense will not be accepted as an alibi to attenuate termination."

The charge of violation of these rules entitled appellant to a dismissal hearing under San Francisco Charter section 8.341.[2] That section requires that the hearing "be conducted forthwith by a qualified and unbiased hearing officer employed under contract by the city and county and selected by

---

[2]The cited charter section provides in part, "No person employed under the civil service provisions of this charter . . . in a position defined by the commission as 'permanent' shall

procedures set forth in the rules of the civil service commission." (S.F. Charter, § 8.341, 1st unnumbered par.)

Civil service commission rules provide: "The hearing itself, as required by Charter, shall be conducted by a hearing officer under contract to the appointing officer chosen as follows in each case: [¶] 1. From organizations such as the American Arbitration Association or the State Conciliation Service which customarily provide hearing officers, OR [¶] 2. From a list of qualified hearing officers certified by the Civil Service Commission, such list to be kept current and to contain at all time at least three (3) names." (S. F. Civil Service Com. Rules, rule 6, § 6.06, subd. C [Hearing Officer Sources].)[3]

In his letter of September 19, 1989, respondent Turpen informed appellant that a dismissal hearing had been scheduled for October 3, 1989, before Hearing Officer Dave Wharton III. During the hearing, which was held November 2, 1989, the hearing officer denied appellant's motion to admit in evidence an affidavit of Sergeant Boyd, offered by appellant to prove that Boyd had received a two-week suspension for lying.

On November 16, 1989, the hearing officer issued his decision and order finding that appellant violated the rules and should be suspended without pay for six months. On May 2, 1994, the trial court denied appellant's petition for writ of mandate. On June 27, 1994, the court denied appellant's motion to tax costs. This timely appeal followed.

### III. DISCUSSION

#### A. *Selection of Hearing Officer*

▌ Appellant concedes that the hearing officer was selected in accordance with rule 6, set out above. He argues, however, that the method of selection, and the fact that the employer pays the hearing officer, deprived appellant of due process. We review this question of law de novo and find no merit to the contention. (*Crocker National Bank* v. *City and County of San Francisco* (1989) 49 Cal.3d 881, 888 [264 Cal.Rptr. 139, 782 P.2d 278].)

 Appellant's contention is based on the premise that respondents had an "unrestricted choice" in selecting a hearing officer. This is not true.

be removed or discharged except for cause, upon written charges, and after an opportunity to be heard in his [or her] own defense."

[3]Unless otherwise indicated, all citations to rules are to San Francisco Civil Service Commission rules.

Section 8.341 of the San Francisco City Charter provides that the hearing shall be conducted by a "qualified and unbiased hearing officer employed under contract by the city and county and selected by procedures set forth in the rules of the civil service commission." As noted above, rule 6, section 6.06, subdivision C, instructs the employer to select a hearing officer from one of two sources: (1) organizations which customarily provide hearing officers, or (2) a civil service commission list. Respondent stated without refutation at the hearing before the superior court on January 28, 1994, that Hearing Officer Wharton was selected from the second source, the civil service commission list. Appellant assumes arguendo that this selection occurred.

The method for creating the civil service commission list is set out in rule 6, section 6.06, subdivision D: "The Civil Service Commission shall certify its list of hearing officers by the following method: [¶] 1. The Commission shall cause to be published in a newspaper of general circulation an announcement of openings for hearing officers. This announcement shall run either for a period of five (5) working days or for two (2) weekends at the discretion of the Commission. [¶] 2. The Commission shall include in its list only such applicants as to satisfy the following criteria: [¶] a. Have at least one (1) year of experience in the conduct of judicial hearings in the capacity of a hearing officer. [¶] b. Have experience in the resolution of disputes involving the interpretation of labor-management contracts. [¶] 3. The Executive Officer shall post the list of panel members so selected for a period of five (5) working days during which time employees, public employee organizations or city departments may seek to demonstrate in writing that any member of the panel is unacceptable. The Executive Officer shall review such challenges and shall determine whether on the basis of the challenge the individual should be eliminated from the approved list."

This procedure for selection of hearing officers cannot reasonably be characterized as granting the City an "unrestricted" selection. To be placed on the list, hearing officers must meet certain criteria, and once they are placed on the list, employees and employee organizations have an opportunity to challenge them. It is apparent that appellant did not utilize that opportunity.

 Appellant suggests that Hearing Officer Wharton was "deprived of impartiality" because he was selected only by employer who had sole responsibility for paying him. According to appellant, the hearing officer thereby "had a financial interest in deciding [the] case favorably for the appointing officer, Respondent Turpen, who hired Respondent Wharton and paid him." Appellant ignores the fact that rule 6, section 6.06, subdivision E,

provided a mechanism by which appellant could have challenged the competence of the hearing officer before the hearing. It states in relevant part: "The employee may challenge the competence of the hearing officer who is scheduled to hear the employee's case on the basis that the officer is in some demonstrable manner biased or prejudiced against the employee and that, therefore, the employee will not be afforded a fair hearing. The challenge must be made [by written affidavit received at least 24 hours before the hearing]."

Appellant's failure to utilize this procedure deprived respondent of an opportunity to address the claim of lack of impartiality, or of bias or prejudice, and precludes appellant from raising the point on appeal. (*Barnes* v. *Personnel Department* (1978) 87 Cal.App.3d 502, 506 [151 Cal.Rptr. 94].) In any event, we find appellant's due process contention to be without merit.

■ In *Titus* v. *Civil Service Com.* (1982) 130 Cal.App.3d 357, 362 [181 Cal.Rptr. 699] (hereafter *Titus*), the Court of Appeal accurately summarized the standard of due process pertinent to such an issue: "Minimal standards of due process require that a public employee receive, prior to imposition of discipline: (1) Notice of the action proposed, (2) the grounds for discipline, (3) the charges and materials upon which the action is based, and (4) the opportunity to respond in opposition to the proposed action. [Citations.] To be meaningful, the right to respond must afford the employee an opportunity to present his [or her] side of the controversy before a reasonably impartial and noninvolved reviewer who possesses the authority to recommend a final disposition of the matter. [Citation.]" ■ Appellant argues that the last element of due process was missing. In our view, this contention is not supported by either the facts or the law.

As far as the facts are concerned, we have already noted that, contrary to appellant's theory, respondent did not have an "unrestricted choice" of hearing officer. ■ Appellant also argues that payment of the hearing officer by respondent renders the hearing officer biased, because the more cases he decides favorably to respondent, the more cases respondent will give him. While this is an interesting theory, appellant's failure to raise the issue below precluded the creation of a meaningful record on the point.[4]

In any event, we do not find the theory compelling as a matter of law. Due process does not require a perfectly impartial hearing officer for, indeed,

---

[4]For example, the record developed below tells us nothing about this hearing officer's past volume of cases for the airport, what period of time is encompassed by those rulings, the nature of his prior rulings, etc.

there is no such thing. (*Andrews* v. *Agricultural Labor Relations Bd.* (1981) 28 Cal.3d 781, 790-791 [171 Cal.Rptr. 590, 623 P.2d 151] (hereafter *Andrews*).) Rather, and as the foregoing quotation from *Titus* suggests, the principle our Supreme Court has established is that due process in these circumstances requires only a "*reasonably* impartial, noninvolved reviewer." (*Williams* v. *County of Los Angeles* (1978) 22 Cal.3d 731, 737 [150 Cal.Rptr. 475, 586 P.2d 956], italics added (hereafter *Williams*).) This formulation of the rule has been quoted and followed not only in *Andrews* and *Titus* but in several other cases as well. (See, e.g., *Coleman* v. *Regents of University of California* (1979) 93 Cal.App.3d 521, 526 [155 Cal.Rptr. 589]; *Civil Service Assn.* v. *Redevelopment Agency* (1985) 166 Cal.App.3d 1222, 1227 [213 Cal.Rptr. 1]; *Burrell* v. *City of Los Angeles* (1989) 209 Cal.App.3d 568, 581 [257 Cal.Rptr. 427].)

Clearly the most significant case applying the rule articulated in *Williams* is *Andrews*. There, agricultural employers sought to disqualify an administrative law officer from hearing an unfair labor practices case, because his law firm had regularly represented Spanish-surnamed persons and farm workers. (*Andrews*, *supra*, 28 Cal.3d at p. 787.) The Supreme Court assumed, arguendo, that these allegations could result in an appearance of bias, and held that such an appearance was not a valid ground for disqualifying a judicial officer.

The court quoted with approval an earlier case which held: " 'In order for the judge to be disqualified, the prejudice must be against a particular party . . . *and* sufficient to impair the judge's impartiality so that it appears probable that a fair trial cannot be held.' (Italics added.)" (*Andrews*, *supra*, 28 Cal.3d at p. 792, quoting *Ensher, Alexander & Barsoom* v. *Ensher* (1964) 225 Cal.App.2d 318, 322 [37 Cal.Rptr. 327].) The Supreme Court explained this two-tier inquiry as follows, "The first inquiry consists of deciding whether the moving party has set forth legally sufficient facts to demonstrate the bias of the judicial officer. After that determination, the challenged judicial officer or a reviewing court must still decide whether such bias will render it probable that a fair trial cannot be held before that judge." (*Andrews*, *supra*, 28 Cal.3d. at p. 792.)[5]

The court reviewed other leading cases and concluded that "our courts have never required the disqualification of a judge unless the moving party

---

[5]The *Andrews* lead opinion repeatedly addresses concerns about fairness. Although, as our dissenting colleague correctly notes (dis. opn., *post*, at p. 793), Justice Mosk did not expressly label that issue as one of "due process," he relied on due process decisions, such as those cited in his footnote 5 (*Andrews*, *supra*, 28 Cal.3d at p. 793), and Justice Newman's concurring opinion explicitly recognized that impartiality in decisionmaking is unquestionably a fundamental due process concept. (*Id.* at pp. 796, 798-799 (conc. opn. of Newman, J.).)

has been able to demonstrate concretely the actual existence of bias." (*Andrews, supra,* 28 Cal.3d at p. 793.)[6] At this point the court acknowledged, in a footnote, that both decisional law and statute provide for disqualification of a judicial officer, even without proof of actual bias, where such is required to preserve the integrity of the legal system. The examples cited included an actual personal or financial interest in the outcome. (See Code Civ. Proc., § 170.1.)[7]

In *Burrell* v. *City of Los Angeles, supra,* 209 Cal.App.3d 568, workers attacked an administrative procedure which permitted the same official who instituted and investigated disciplinary proceedings and recommended a particular penalty, to have the final say on the severity of penalty imposed. The court found that federal law permitted the procedure and that state law follows the federal requirement of showing actual bias or prejudice. In so doing the court emphatically reasserted the ruling in *Andrews.* (*Id.* at pp. 575-582.) Although the facts of the instant case are distinguishable from those in *Burrell,* the decision is instructive here because it expressly applies due process analysis to the fairness requirement in an administrative disciplinary hearing. It is also significant because it highlights the less exacting due process requirements applicable to administrative hearings as compared to judicial proceedings. (*Id.* at p. 578.) This latter point was also stressed by Justice Newman in his *Andrews* concurrence. (*Andrews, supra,* 28 Cal.3d at pp. 796-797 (conc. opn. of Newman, J.).)

Appellant cites no California cases even remotely on point in support of his due process claim. On the other side of the coin, we find authority such as *Binkley* v. *City of Long Beach* (1993) 16 Cal.App.4th 1795 [20 Cal.Rptr.2d 903] (hereafter *Binkley*) persuasive. There, the city removed its police chief (Binkley) for various counts of misconduct. The city manager selected a hearing officer to conduct an appeal hearing, and retained the right to make the final decision. Binkley objected to the scope of the hearing and to the city manager's final authority. The hearing officer recommended that the discharge be sustained, and the city manager agreed. The Court of Appeal found that Binkley had received due process in the removal procedure,

---

[6]The fact that the statute in effect at the time of the *Andrews* decision (former Code Civ. Proc., § 170, subd. (a)(5)) was subsequently replaced by Code of Civil Procedure section 170.1, subdivision (a)(6)(C), as we acknowledged in *Catchpole* v. *Brannon* (1995) 36 Cal.App.4th 237, 246 [42 Cal.Rptr.2d 440], in no way lessens the import of the California Supreme Court's *Andrews* holding as to what type of a showing is required in order to find bias.

[7]If it is the position of appellant and our dissenting colleague that, by virtue of the way the hearing officer is selected and compensated, he or she thus has a "financial interest" in the case, we would be constrained to note that, as suggested by footnote 5 of *Andrews, supra,* 28 Cal.3d at page 793, "financial interest" in this context should be as defined in Code of Civil Procedure section 170.5, subdivision (b), nothing less but also nothing more.

stating that "due process is flexible and calls for such procedural protections as a particular situation demands." (*Binkley, supra,* 16 Cal.App.4th at p. 1807, citing *Mathews* v. *Eldridge* (1976) 424 U.S. 319, 334 [47 L.Ed.2d 18, 32-33, 96 S.Ct. 893].)

The court rejected claims that the hearing officer was not neutral and concluded that Binkley had been treated fairly when he was afforded a factfinding hearing before a professional hearing examiner, who was not " 'embroiled in the controversy.' " (*Binkley, supra,* 16 Cal.App.4th at p. 1810.) An allegation at the appellate level of bias could not prevail. " 'Bias and prejudice are not implied and must be clearly established. A party's unilateral perception of bias cannot alone serve as a basis for disqualification. Prejudice must be shown against a particular party and it must be significant enough to impair the adjudicator's impartiality. The challenge to the fairness of the adjudicator must set forth concrete facts demonstrating bias or prejudice.' " (*Ibid.*)

Here, as in *Binkley,* no facts support a claim that respondent hearing officer was biased. He was entitled to the benefit of a presumption that he was " ' "of conscience and intellectual discipline" ' " and judged the case fairly. (*Binkley, supra,* 16 Cal.App.4th at p. 1810.) Nothing indicates he had a personal financial stake in the matter or harbored any animosity toward appellant.[8]

Appellant and our dissenting colleague rely heavily on cases dealing with First Amendment rights implicated in agency shops. (E.g., *Teachers* v. *Hudson* (1986) 475 U.S. 292 [89 L.Ed.2d 232, 106 S.Ct. 1066] (hereafter *Teachers*), affirming *Hudson* v. *Chicago Teachers Union Local No. 1* (7th Cir. 1984) 743 F.2d 1187, 1195 (hereafter *Hudson*).) We do not find them persuasive. In those cases, the union and board of education had a collective bargaining agreement that named the union the exclusive agent of teachers and other employees. A union security clause in the contract required nonunion members of the bargaining unit to pay their proportionate share of the union's cost in negotiating and administering the contract. Nonunion teachers brought suit against the board "challenging the procedure established pursuant to the collective bargaining contract for determining the proportionate share that nonunion employees must contribute to the support of the union as collective bargaining agent." (*Hudson, supra,* 743 F.2d at p. 1190.) The district court upheld the procedure.

---

[8]In contrast are decisions in which the high courts of two states have struck down procedures where judges had a direct financial stake, over and above their salaries, in performance of judicial duties. (*State* ex rel. *Shrewsbury* v. *Poteet* (1974) 157 W.Va. 540 [202 S.E.2d. 628, 72 A.L.R.3d 368] [magistrates may not accept fees, other than salary, for performance of judicial duties]; *State* ex rel. *McLeod* v. *Crowe* (1978) 272 S.C. 41 [249 S.E.2d 772] [justice for sale].)

The Court of Appeals for the Seventh Circuit reversed. The court framed the question and its holding as having two aspects, one dealing with free speech, the other with due process. The free speech holding was that the agency shop contract must provide a procedure which gives reasonable protection for nonunion members, making it unlikely that some of the money collected from them will be used to support political objectives outside the union's function in the collective bargaining process; such an improper use would violate their First Amendment rights. (*Hudson, supra,* 743 F.2d at p. 1192.)

In the "due process" portion of the opinion, the court found that forcing a public employee to support a union deprives him or her of "liberty" (freedom of association) within the meaning of the Fourteenth Amendment and, therefore, requires the employer to give him or her due process of law in the sense of fair procedure "quite apart from any procedural safeguards required by the First Amendment directly." (*Hudson, supra,* 743 F.2d at p. 1193.)

The procedure in question provided that the objecting employee went before an arbitrator picked by the union president from a list of arbitrators accredited by the state board of education; the union paid the arbitrator's fee; the arbitrator's decision was final. From start to finish the procedure was "entirely controlled by the union" (*Hudson, supra,* 743 F.2d at p. 1194.) By contrast, in the system at issue here the procedure is not entirely controlled by respondent and is followed by court review at the trial and appellate levels.

The *Hudson* court stated: "The arbitrator is paid for each arbitration, and this gives him a financial interest in deciding cases favorable to the union—which hires him, and incidentally which pays him." (*Hudson, supra,* 743 F.2d at p. 1195.) For guidance on remand, the court suggested "that the constitutional minimum would be fair notice, a prompt administrative hearing before the board of education or some other state or local agency—the hearing to incorporate the usual safeguards for evidentiary hearings before administrative agencies—and a right of judicial review of the agency's decision." (*Id.* at p. 1196.)

The United States Supreme Court affirmed the judgment, but in a decision much less expansive than that of the Court of Appeals.[9] The court held that the third of three "fundamental flaws" in the union procedure was that it "did not provide for a reasonably prompt decision by an impartial decisionmaker." (*Teachers, supra,* 475 U.S. at p. 307 [89 L.Ed.2d at p. 247].) "The

[9]The court said, "We affirm the judgment of the Court of Appeals, but we do not find it necessary to resolve all of the questions discussed in its opinion." (*Teachers, supra,* 475 U.S. at p. 301 [89 L.Ed.2d at p. 243].)

nonunion employee, whose First Amendment rights are affected by the agency shop itself and who bears the burden of objecting, is entitled to have his objections addressed in an expeditious, fair, and objective manner." (*Ibid.*) The court emphasized that it is the impingement on First Amendment interests that requires "reasonably prompt decision by an impartial decision-maker." (*Id.* at p. 309 [89 L.Ed.2d at p. 249].)

The court also held that the union's "unrestricted choice [of an arbitrator] from the state list" was inadequate. (*Teachers, supra,* 475 U.S. at p. 308 [89 L.Ed.2d at p. 248].) But at the same time the court rejected the Court of Appeals suggestion that a "full-dress administrative hearing, with evidentiary safeguards" was required. (*Id.* at p. 308, fn. 21 [89 L.Ed.2d at p. 248].) The court noted that expeditious arbitration would be satisfactory if the arbitrator was not one party's unrestricted choice. (*Ibid.*)

We find these teachers union cases inapposite for at least four reasons. First of all, in the case at hand the First Amendment is not involved. Second, the choice of hearing officer was not "unrestricted"; not only was the choice confined to two highly reputable panels, but the procedural scheme allowed for not one but two opportunities for challenge of the hearing officer by the employee or the employee organization. Third, although the Court of Appeals viewed the payment of the arbitrator by one party as establishing bias, the Supreme Court neither discussed nor affirmed that view. Fourth, and probably most importantly, we view the California Supreme Court's rulings in *Williams* and *Andrews,* discussed above, to be controlling as to how expansive the courts of this state can and should be in applying the admittedly flexible concept of due process.[10]

Thus, in our view we are constrained to examine this issue in the terms our Supreme Court has told us to apply in such circumstances, i.e., the test of

[10]Our dissenting colleague rests his arguments mainly, if not entirely, on due process cases from the United States Supreme Court. Of course, that court is and should be the principal source of guidance as to what the federal Constitution's due process clause means in this—and all other—contexts, but because the whole concept of due process is so flexible and its application so dependent on the underlying facts (see, e.g., *Mathews* v. *Eldrige, supra,* 424 U.S. at pp. 334-335 [47 L.Ed.2d at pp. 32-33]), we think the solution to the principal issue presented in this case can and should be found in the decisions of our state's courts, decisions we have discussed at some length above. But, additionally, we respectfully suggest that the United States Supreme Court decisions Justice Kline relies upon in no way compel a different result than we reach here. Those decisions, considered together, teach us that due process does not require disqualification of a judicial officer for the "slightest pecuniary interest" (see *Aetna Life Insurance Co.* v. *Lavoie* (1986) 475 U.S. 813, 825-826, fn. 3 [89 L.Ed.2d 823, 834-835, 106 S.Ct. 1580] (hereafter *Aetna*)) or where the interest is either "speculative and contingent" (*id.* at p. 826 [89 L.Ed.2d at p. 836]) or "remote and insubstantial." (*Marshall* v. *Jerrico, Inc.* (1980) 446 U.S. 238, 243 [64 L.Ed.2d 182, 188-189, 100 S.Ct. 1610].) It is, however, required where the officer has a " ' "direct, personal, substantial, [and] pecuniary" ' " interest. (See *Aetna, supra,* 475 U.S. at p. 824 [89 L.Ed.2d at p. 834], quoting *Ward* v. *Village of Monroeville* (1972) 409 U.S. 57, 60 [34 L.Ed.2d 267, 27-271, 93 S.Ct. 80]

whether the hearing officer is a "reasonably impartial, noninvolved reviewer." (See *Williams, supra*, 22 Cal.3d at p. 737.) When that test is applied, it is clear that appellant has failed to show that he was not. More specifically, we note that (a) the hearing officer was selected from one of two preferred lists derived from reputable and presumptively impartial organizations, (b) no challenge to any perceived bias on his part was undertaken via either of two separate procedures provided for such challenges, (c) absolutely no record was made by appellant at either the administrative level or in the superior court as to any record of any bias on his part, and (d) there is no suggestion of any manifestation of bias in his conduct of the hearing below.

Where, as here, prejudice or actual bias is not shown, current law provides an alternative standard for possible disqualification: a judicial officer may be disqualified under the "objective" standard set out in Code of Civil Procedure section 170.1, subdivision (a)(6)(C). "A judge shall be disqualified if any one or more of the following is true: . . . a person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial." Since the underlying events are undisputed, the question of whether the hearing officer could be impartial under the quoted provision is one of law. (*Flier* v. *Superior Court* (1994) 23 Cal.App.4th 165, 170-171 [28 Cal.Rptr.2d 383].)

In the case before us the record does not sustain even an "appearance of bias." If, as noted earlier, appellant had shown how many cases Hearing Officer Wharton had decided, how many of those were for the San Francisco Airport, and how many rulings were in favor of that employer, an objective person might be able to perceive an appearance of bias. The record is devoid of even a scintilla of such information, yet the appellant and our dissenting colleague would have us rule not only that Hearing Officer Wharton was disqualified to serve, but that the entire system of selecting San Francisco civil service hearing officers was and is constitutionally defective. This we respectfully decline to do. Any such ruling would be based upon nothing more than a charge of an appearance of bias in a case where appellant failed to take advantage of not one but two distinct opportunities to challenge the hearing officer on such grounds.

(hereafter *Ward*)), quoting *Tumey* v. *Ohio* (1927) 273 U.S. 510, 523 [71 L.Ed. 749, 754-755, 47 S.Ct. 437, 50 A.L.R. 1243] (hereafter *Tumey*).) Justice Kline, however, stresses that language from *Tumey* which speaks of a "possible temptation" to a judge and suggests that that is the test we should be applying. (Dis. opn., *post*, at pp. 787-788.) We reject this contention for two reasons. First of all, we think the most recent decision in this line of cases, *Aetna*, makes clear that "possible temptation" does *not* include instances where the interest is "speculative and contingent" (*Aetna, supra*, 475 U.S. at p. 826 [89 L.Ed.2d at p. 836]), which is the absolute most that is involved here. Second, even if *Tumey* and *Ward* are considered without the benefit of *Aetna*, we think they clearly mean that the "possible temptation" mentioned *occurs when* there is a direct, personal, substantial, pecuniary interest and that the use of the former language does not enlarge the nature of the prohibited interest.

Our conclusion on this issue should not be construed as an embrace of the procedure employed by the San Francisco Airport in this case and, presumably, by the City and County of San Francisco in such cases generally. Common sense coupled with a minimal degree of experience in today's burgeoning arena of alternative dispute resolution compels the conclusion that some form of mutual selection of an arbitrator, mediator or hearing officer is preferable to the current San Francisco Airport procedure. This would seem to be particularly so where, as here, that person is paid entirely by the selecting party. But we have no interest in accepting appellant's invitation—now seconded by our dissenting colleague—to elevate a preference for mutual over unilateral selection to a matter of federal or state constitutional right, especially on the facts of this case and given the rather clear principles articulated by our Supreme Court in *Williams* and *Andrews*. The combination of that court's holding that due process requires only a "reasonably impartial, noninvolved reviewer" (*Williams, supra,* 22 Cal.3d at p. 737) and the United States Supreme Court's holding in *Aetna* that that doctrine does not mandate disqualification where any interest is "speculative and contingent" (*Aetna, supra,* 475 U.S. at p. 826 [89 L.Ed.2d at p. 836]) makes crystal clear to us, even if it does not to appellant and our dissenting colleague, that due process does not compel reversal here. That concept is not so pliant that it can be extended to cover a circumstance such as the present one where, at most, an inferior hearing officer selection process is prescribed. To hold otherwise would be an exercise in judicial activism that would be as regrettable as it is obvious.

B.-D.*

. . . . . . . . . . . . . . . . . . . . . . . . .

## IV. DISPOSITION

The judgment is affirmed.

**PHELAN, J.—** I concur in the opinion of Justice Haerle rejecting appellant's claim that he was denied due process because respondent had an "unrestricted choice" in the selection of the hearing officer as well with the discussion of the other issues resolved. I write separately only to stress that the "pecuniary conflict of interest" issue was *never* (directly or indirectly) raised in the mandamus proceedings before the superior court which we review. Accordingly, I believe that issue has been waived and we should not consider it.

That the pecuniary conflict of interest issue was not presented below is unmistakably clear from the record before us. The second verified petition

---

*See footnote, *ante,* page 763.

for writ of administrative mandamus focused entirely on the issue of "unrestricted choice" and the failure to give appellant "an opportunity to participate in the selection of the hearing officer." Nowhere did appellant allege as a ground for setting aside his suspension that he had been denied due process because Hearing Officer Wharton had a financial conflict of interest since he was "under contract" with respondent. Throughout the lower court proceedings, appellant consistently and only pursued his theme that his due process denial resulted from respondent's unilateral and unrestrained choice in the selection of the hearing officer. There was simply no claim that it arose from Wharton's alleged financial incentive to decide his case favorably to respondent.

Appellant's first assertion of a claim of denial of due process based upon financial conflict of interest appears in his opening brief in this court. Therein he initially mentions, almost parenthetically and in passing, that respondent "was also responsible for paying . . . Wharton's fees." Later, he develops the point and adds it to his "unrestricted choice" argument. The failure to raise the financial conflict of interest in the court below precludes our consideration of it on appeal. (See *North Coast Business Park* v. *Nielsen Construction Co.* (1993) 17 Cal.App.4th 22, 28-30 [21 Cal.Rptr.2d 104]; Eisenberg et al., Cal. Practice Guide: Civil Appeals & Writs (The Rutter Group 1995) ¶¶ 8:229 to 8:240, pp. 8-78 to 8-80.)

Application of the waiver rule is particularly appropriate in this case because factual issues related to the alleged financial conflict of interest were never developed in the trial court. (*Richmond* v. *Dart Industries, Inc.* (1987) 196 Cal.App.3d 869, 879 [242 Cal.Rptr. 184].) On the record before us, we simply do not know the extent of Wharton's alleged financial conflict of interest. We only know that, under the commission rule, he was "under contract" to respondent. Any financial interest he might have in deciding appellant's case could be de minimis or it could be of a nature which unquestionably would lead him to favor respondent. Thus, whether there was a financial interest of such a dimension which would rise to the level of a "direct, personal, substantial, pecuniary interest in reaching a conclusion against" appellant (*Aetna Life Insurance Co.* v. *Lavoie* (1986) 475 U.S. 813, 821-822 [89 L.Ed.2d 823, 832-833, 106 S.Ct. 1580]) and constitute a denial of due process, can only be the subject of speculation. We simply do not know its nature or magnitude and can only guess as to its impact, if any.

Presiding Justice Kline's dissent suggests that the "under contract" provision of rule 6.06 of the San Francisco Civil Service Commission Rules "tells us all we need to know." (See dis. opn., *post*, at p. 796.) He would be right if his premise were correct—that is, under *Tumey* v. *Ohio* (1927) 273 U.S.

510 [71 L.Ed. 749, 47 S.Ct. 437, 50 A.L.R. 1243], even a slight economic incentive to rule a particular way offends due process. However, as Justice Haerle's opinion notes, the United States Supreme Court has specifically declined "to read *Tumey* as constitutionalizing any rule that a decision rendered by a judge with 'the slightest pecuniary interest' constitutes a violation of the Due Process Clause." (*Aetna Life Insurance Co.* v. *Lavoie*, *supra*, 475 U.S. at pp. 825-826, fn. 3 [89 L.Ed.2d at p. 835].) The even more attenuated "possible temptation," which the dissent claims exists by virtue of the "under contract with the appointing authority" provision, perforce cannot give rise to a denial of due process.

Accordingly, I believe the financial conflict of interest issue has not been preserved for appeal and decline to join in that aspect of the controversy otherwise eloquently addressed by my colleagues.

**KLINE, P. J.,** Dissenting.—Under the procedure we review in this case an "appointing authority," or employer, that wishes to discharge a civil servant completely controls the selection of the hearing officer who finally determines whether the proposed discharge will be effectuated. If this were not enough to skew the process against employees, the pecuniary conflict of interest inherent in this process certainly does so. Because their income depends upon the number of cases they hear, hearing officers have an economic incentive to rule in favor of the employers who provide them remunerative work.

Justice Haerle's statement that this selection process "does not sustain even an 'appearance of bias' " (lead opn., *ante*, at p. 776) is incomprehensibly blind to what I consider an obvious reality. My conclusion that appellant and other civil servants are denied due process of law is not, as Justice Haerle says, the product of a "regrettable" exercise in "judicial activism" (lead opn., *ante*, at p. 777) but of respect for the Constitution, as that document has been unmistakably construed by the courts of this state and nation, in opinions the majority ignores or distorts.

As will be seen, the majority has not only unjustifiably refused to follow the principle articulated in *Teachers* v. *Hudson* (1986) 475 U.S. 292 [89 L.Ed.2d 232, 106 S.Ct. 1066] (*Chicago Teachers Union*), but has so constricted the doctrine of *Tumey* v. *Ohio* (1927) 273 U.S. 510 [71 L.Ed. 749, 47 S.Ct. 437, 50 A.L.R. 1243], as to render that seminal case and its progeny virtually meaningless. By distorting the law, the majority restricts the reach of the due process clause with respect to an increasingly significant class of cases. If permitted to stand, the lead opinion will require the courts of this state to blind themselves to the conflict of interest created by the pecuniary

interests of the growing number of independent arbitrators whose income depends upon the number of cases they are selected to hear.

As will also be seen, the constitutional issue was adequately litigated below. The claim that the hearing officer had a pecuniary conflict of interest was never waived, the conflict appears on the face of the challenged rule, and is in any case not crucial to appellant's constitutional claim. I therefore disagree with Justice Phelan's view that we should avoid the important question this case presents.

## I.

The majority's analysis rests on the contentions that respondent employer did not have an "unrestricted choice" of hearing officers; that, in any event, appellant had the right to challenge the competence of the hearing officer prior to the hearing; and that by failing to make such a challenge he waived the right to do so now. These contentions do not stand up to scrutiny.

Under the San Francisco civil service rules, the employer's choice of hearing officer is considerably *less* restricted than the "unrestricted" choice condemned in *Chicago Teachers Union.*

First of all, there is no meaningful restriction on the size of the universe of potential hearing officers from which the appointing authority must choose. Subdivision C of San Francisco Civil Service Commission rule 6, section 6.06 (Rule 6) permits the selection to be made not just "[f]rom a list of qualified hearing officers certified by the Civil Service Commission," but also from organizations "*such as*" the American Arbitration Association. The appointing authority may therefore select individuals associated with a broad range of public agencies and private organizations providing dispute resolution services. Hundreds if not thousands of people inhabit this capacious universe, and the number appears to be rapidly increasing.[1]

Pointing out that the hearing officer in this case was chosen from the civil service commission's list, the majority describes the various criteria that must be satisfied in order for a hearing officer's name to be placed on that

---

[1]See, e.g., Note, *Private Justice: How Civil Litigation is Becoming a Private Institution—The Rise of Private Dispute Centers* (1994) 23 Sw.U.L.Rev. 621, 626, quoting Breznick, *Arbiters Growing Out of Court's Gridlock* (Apr. 27, 1992) Crains's N.Y. Bus. at page 9 (panelists of American Arbitration Association "handled more than 62,000 cases nationwide last year," i.e., 1991); Kim, *Rent-A-Judges and the Cost of Selling Justice* (1994) 44 Duke L.J. 166, 175 ("Over the past decade, the number of retired judges for hire has increased exponentially").

list, suggesting that such an elaborate process "cannot reasonably be characterized as granting the City an 'unrestricted' selection." (Lead opn., *ante*, at p. 769.) The due process deprivation cannot, however, be cured by the manner in which an employer exercises his or her unilateral right to select a hearing officer, because the constitutional problem lies in the mere existence of such total control over the decisionmaking process by an interested party.

Respondent's claim that employees can challenge the hearing officer selected by the appointing officer is also inaccurate, and for several reasons. First, a challenge may be made only on the basis of a showing of actual bias.[2] Unlike employers, who are regularly involved in the administrative process, individual civil servants are far less likely to be aware of the predilections of any particular hearing officer. Furthermore, Rule 6.06 discourages employees from challenging the hearing officer selected by the employer by providing that they may have to bear the costs such a challenge may entail.[3] Finally, the employer need not defer to any challenge an employee may have the information to justify and the nerve to make, even if the employee shows actual bias. Subdivision E of Rule 6.06 requires the selection of another hearing officer only "[i]n the event that the *appointing authority* shall determine that the hearing officer cannot afford the employee a fair hearing." If the appointing authority, which is the employer, does not agree with the employee's claim of bias, the employer can refuse to select another, and the civil service rules provide for no appeal from the employer's final determination.

In any event, the signal reason an employee's theoretical right to challenge the hearing officer selected by the employer is constitutionally irrelevant is that it would not solve the due process problem created by Rule 6 even if it were accepted and the employer selected another hearing officer. The employer remains free to select, and presumably will select, another person believed to be more sympathetic to the employer's position rather than that of the discharged employee. Nor can a challenge eliminate the hearing officer's pecuniary conflict of interest. The economic interest of the hearing officer may not be a problem, or as great a problem, where the contending parties jointly select the hearing officer, as is conventionally

---

[2]Subdivision E of Rule 6, section 6.06 states that an employee may challenge the competence of the hearing officer selected by the appointing authority "on the basis that the hearing officer is in some demonstrable manner biased or prejudiced against the employee and that, therefore, the employee will not be afforded a fair hearing."

[3]Subdivision I of Rule 6, section 6.06 states that "[t]he department bringing charges against an employee shall pay all fees for hearing officers" *except* costs "incurred as a result of any request of the employee (such as costs occasioned by . . . challenges of [a] hearing officer)" which shall be borne by the employee."

done.[4] Absent the employee's consent to the hearing officer selected, which the court below refused to require, the process prescribed by Rule 6.06 is inherently incapable of producing the reasonably impartial and uninvolved decisionmaker required by the Charter of the City and County of San Francisco, and by the Constitution. (*Titus* v. *Civil Service Com.* (1982) 130 Cal.App.3d 357, 362 [181 Cal.Rptr. 699].) Hearing officers selected pursuant to that rule will necessarily have an interest in the outcome of the cases they decide, which cannot be reconciled with due process of law. (*In re Murchison* (1955) 349 U.S. 133, 136 [99 L.Ed. 942, 946, 75 S.Ct. 623].)

The fact that an employee fails to make an objection that would not solve the asserted constitutional violation even if it were sustained cannot preclude the employee from raising the issue on appeal. *Barnes* v. *Personnel Department* (1978) 87 Cal.App.3d 502 [151 Cal.Rptr. 94], which the majority relies on for the proposition that appellant's failure to make such a quixotic objection is terminal, is inapposite, as the objection in that case, if sustained, would have solved the asserted deprivation of due process. Furthermore, because the employee in *Barnes* could be terminated without cause, his failure to timely object to the hearing officer was really beside the point.

## II.

One of the chief flaws in the majority opinion is its fundamental misconception of the issue. The claim in this case is not that Hearing Officer Wharton has an actual bias against employees generally or appellant in particular, or that the appearance of bias is created by something unique to Mr. Wharton. The claim in this case, which differentiates it from most of the

---

[4]One commentator believes that not even consent can completely eliminate the problem created by the fact that "referees may be influenced to decide cases in favor of the party more likely to bring cases to them in the future." (Note, *The California Rent-A-Judge Experiment: Constitutional and Policy Considerations of Pay-As-You-Go Courts* (1981) 94 Harv. L.Rev. 1592, 1608.) "To a certain extent this problem would be solved by the consent requirement, since no one would consent to a reference if he knew the referee would favor his opponent. As a safeguard, however, consent would only be effective in protecting the integrity of reference proceedings if all parties had perfect knowledge about all referee decisions. Those parties with the greatest experience with reference, however, would have superior knowledge. Similar parties in other contexts have been called 'repeat players,' but under the market conditions that prevail in reference, they might better be termed steady customers. Steady customers represent an important asset to any seller and a referee would find it in his self interest to favor those parties where possible. Of course, any favoritism could not be overt, for then the opponents of the steady customers would refuse to consent. But over time, referees could safely give steady customers the benefit of the doubt more often than not. Steady customers would suspect that their status was giving them a small edge, and this would bring them back into reference for future fights. But their opponents, the one-time customers, would not be aware of the subtle systemic bias working against them. They could not therefore make a fully informed choice when they consented to the reference." (*Ibid.*, fn. omitted.)

cases the majority relies upon, is that the danger of bias is inherent in the prescribed selection process.

While *Chicago Teachers Union, supra,* 475 U.S. 292 is not the only Supreme Court case bearing on the issues in this case, it is the right place to begin the constitutional analysis. The union in that case was the exclusive bargaining agent for teachers, of whom 95 percent were members. Until 1982, the union's collective bargaining costs were met by members' dues, and nonmembers received the benefits of the union's representation without making any contribution. In order to solve this "free rider" problem, the union and the board of education entered into an agreement requiring the board to deduct "proportionate share payments" from nonmembers' paychecks. The union established a three-step procedure for considering nonmembers' objections to the deductions. This procedure is best described in that portion of the opinion of the Seventh Circuit referred to by the Supreme Court: "an objecting nonunion member has 30 days . . . to file an objection with the union. The union's executive committee reviews the objection. If it rejects it, the objector has 30 days to appeal to the committee, and if he appeals in time he is entitled to a personal hearing. If his objection is turned down on the basis of that hearing, he can ask for arbitration. The union's president picks the arbitrator from a list of arbitrators accredited by the state board of education; the union pays the arbitrator's fee; and the arbitrator's decision is final." (*Hudson* v. *Chicago Teachers Union Local No. 1* (7th Cir. 1984) 743 F.2d 1187, 1194.)

Objecting nonmembers brought suit in federal district court, challenging the union's procedure on the ground, among others, that it denied their Fourteenth Amendment due process rights. The district court rejected the challenges and upheld the procedure. The Seventh Circuit reversed.

Circuit Judge Posner pointed out that the arbitrator was not independent but was picked by the union. "It is true that he is picked from a list which, we are told, contains about 50 names, thus confining the union's choice somewhat. But even if the Illinois law imposes on the union the identical duty of fair representation that the union would have if it were subject to the Railway Labor Act or the National Labor Relations Act, the union's relationship to dissenting members of the bargaining unit would, as a realistic matter, contain a sufficient residue of adverseness to raise serious objections to giving the union a unilateral choice of arbitrator . . . . There are 15 federal district judges in active service in the Northern District of Illinois, all unimpeachably accredited; and yet the union would not try to defend a procedure that let it (or the dissenters!) pick the judge to preside in this case. [Citations.]" (473 F.2d at p. 1195.)

In the present case, as noted, the employer may select from an almost unrestricted universe of hearing officers affiliated with virtually any public or private dispute resolution organization (including corporate entities designed to profit the organization as well as participating hearing officers) and is empowered to reject a for-cause challenge to the officer he or she selects, even assuming the employee is willing to bear the additional costs a challenge may entail. The employer's relationship to an employee targeted for discharge certainly contains a "residue of adverseness" sufficient to make the employer's total control over the selection process a due process problem. But the employer's unilateral power to select the hearing officer is by no means the only source of the constitutional problem.

Judge Posner noted that the situation in *Chicago Teachers Union*, as here, was even more "troublesome" because "[t]he arbitrator, unlike a federal judge, is not paid a salary that is independent of the number of cases he presides over, or of the goodwill of a litigant. The arbitrator is paid for each arbitration, and this gives him a financial interest in deciding cases favorably to the union—which hires him, and incidentally which pays him. '[N]o man is permitted to try cases where he has an interest in the outcome.'" (*Hudson* v. *Chicago Teachers Union Local No. 1, supra,* 743 F.2d at p. 1195, quoting *In re Murchison, supra,* 349 U.S. 133, 136 [99 L.Ed. 942, 946].) The Seventh Circuit's assessment of the procedure and determination that it violated the due process clause was affirmed by the Supreme Court. (*Chicago Teachers Union, supra,* 475 U.S. 292.) Although the Supreme Court opinion focuses most heavily on a First Amendment issue not present in the instant case, the Court expressly agreed with Judge Posner that "the 'most conspicuous feature of the procedure is that from start to finish it is entirely controlled by the union, which is an interested party, since it is the recipient of the agency fees paid by the dissenting employees.'" (475 U.S. at p. 308 [89 L.Ed.2d at p. 248], quoting *Hudson* v. *Chicago Teachers Local No. 1, supra,* 743 F.2d at pp. 1194-1195.) The Supreme Court observed that review of the determinations of union officials by an arbitrator selected by the union was inadequate "because the selection represents the Union's unrestricted choice from the state list." (*Ibid.*)

Though it is controlled by an employer rather than a labor union, the procedure challenged in the present case is materially indistinguishable from that condemned in *Chicago Teachers.* The hearing officer who will determine the propriety of the employee discharge at issue cannot be blind to the interest in that issue of the party which selected him or her and pays the fee,

and has the ability to do so again in future cases.[5] And it is not only the interests of the particular employer involved in a given case that may affect a hearing officer's attitude. A hearing officer seen by other employers as unduly indulgent of the interests of employees they wish to discharge, runs the risk he or she will not be selected by them either, or will not be selected as frequently as might otherwise be the case, and will suffer the adverse economic consequences. Therefore, regardless whether they act on it, hearing officers selected pursuant to Rule 6 have a financial interest in rejecting the claims of employees and upholding those of appointing officers. In contrast, the hearing officer has no incentive to "accord equal favor to one-time customers," such as appellant. (Kim, *Rent-A-Judges and the Cost of Selling Justice, supra,* 44 Duke L.J. 166, 177-178, fns. omitted.) Finally, like the arbitrator in *Chicago Teachers Union,* the decision of the hearing officer selected by the party that controls the process is "final." (S.F. Charter, § 8.341.)[6]

The majority claims *Chicago Teachers Union* is inapposite for four reasons. Not one of them is persuasive.

The first reason is that the present case does not involve the First Amendment. (Lead opn., *ante,* at p. 773.) This is almost like saying that the rule announced in *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], applies only to criminal defendants charged with kidnapping and rape, as those were the only crimes for which Mr. Miranda was tried. The discussion in *Chicago Teachers Union* of due process requirements is unrelated to the First Amendment issue also presented in that case. It is enough that the right to continued employment at stake in this case is a property interest which, like rights arising under the First Amendment, cannot be abridged without due process of law. (*Skelly* v. *State Personnel Bd.* (1975) 15 Cal.3d 194, 206, 208 [124 Cal.Rptr. 14, 539 P.2d 774]; *Williams* v. *County of Los Angeles* (1978) 22 Cal.3d 731, 736 [150 Cal.Rptr. 475, 586 P.2d 956]; *Walker* v. *City of Berkeley* (9th Cir. 1991) 951 F.2d 182, 183.)

The second basis upon which the majority purports to distinguish *Chicago Teachers Union* is that the choice of hearing officer in this case was not

---

[5]Rule 6 expressly provides that "[t]he department bringing charges against an employee shall pay all fees of hearing officers . . . ." (Rule 6, § 6.06, subd. E.)

[6]The majority purports to differentiate the system at issue here from that at issue in *Chicago Teachers' Union* on the ground that the administrative system we are reviewing "is followed by court review at the trial and appellate levels." (Lead opn., *ante,* at p. 774.) In fact there is no such difference. Judicial review is available in this case, as presumably in *Chicago Teachers' Union,* not because it is provided for in the regulatory scheme, but because it is available under codified rules of civil procedure. (Code Civ. Proc., § 1094.5.)

"unrestricted," and the employee can assertedly challenge the one selected by the appointing authority. As already explained, however, there are not just "about 50" persons an appointing authority may select from, as in *Chicago Teachers Union*, but many hundreds if not thousands of individuals eligible to be selected under the civil service rules (most or at least many of whom are economically dependent upon such business); challenges are discouraged by the additional costs that may be imposed on employees who object to the hearing officer selected; and if a challenge is made the employer can unilaterally finally reject it, no matter how compelling the showing of bias may be. Finally, and most significantly, a challenge would be useless even if it was allowed by the employer, *as it would simply result in the selection by the employer of another hearing officer felt to be more sympathetic to management than to employees, who would have precisely the same pecuniary conflict of interest as the one removed.*

The third basis upon which Justice Haerle unsuccessfully endeavors to distinguish *Chicago Teachers Union* is that "although the Court of Appeals viewed the payment of the arbitrator by one party as establishing bias, the Supreme Court neither discussed nor affirmed that view." (Lead opn., *ante*, at p. 775.) As previously explained, the Supreme Court refrained from discussing the pecuniary conflict of interest not because it disagreed with the Seventh Circuit on that issue, but merely because it did not need to reach it. The Supreme Court affirmed the Seventh Circuit without providing any indication of disagreement with this aspect of the intermediate appellate court's view on this matter.[7] The Seventh Circuit's analysis of the pecuniary conflict of interest not only makes eminent sense but its opinion remains

[7]There is only one respect in which the Supreme Court expressed any disagreement with the Court of Appeal, and the Supreme Court's explanation of that difference dramatizes the absence of any disagreement with the portion of the Court of Appeal's opinion pertaining to the pecuniary conflict of interest. After stating that review by a union-selected arbitrator "is also inadequate because the selection represents the Union's unrestricted choice from the state list" (475 U.S. at p. 308 [89 L.Ed.2d at p. 248]), the court went on to say, by way of footnote, "We do not agree, however, with the Seventh Circuit that a full-dress administrative hearing, with evidentiary safeguards, is part of the 'constitutional minimum.' Indeed, we think that an expeditious arbitration might satisfy the requirement of a reasonably prompt decision by an impartial decisionmaker, *so long as the arbitrator's selection did not represent the Union's unrestricted choice. In contrast to the Union's procedure here, selection of an arbitrator frequently does not represent one party's choice from a list of state-approved arbitrators.* [Citations.]" (475 U.S. at p. 308, fn. 21 [89 L.Ed.2d at p. 248], italics added.) This statement shows, if any showing be needed, that the Supreme Court knows how to express disagreement with any part of a lower court's opinion whose judgment it affirms. Furthermore, the substance of the statement indicates why the Supreme Court did not address the pecuniary conflict that had been emphasized by the Court of Appeal. Clearly, the union's unilateral power to select the hearing officer was all that was needed to condemn the process; discussion of the pecuniary conflict of interest was not only unnecessary but might dilute the significance of the threshold factor the court found dispositive.

authoritative. In any event, the selection process at issue in this case would be unconstitutional even if, as is not the case, the Supreme Court disagreed with the Seventh Circuit's analysis of the pecuniary conflict of interest. The pecuniary conflict of interest does not create but merely aggravates the due process violation. As appellant has consistently maintained, the Supreme Court's analysis and holding in *Chicago Teachers Union* would require us to rule in his favor even if a hearing officer's income did not depend on the number of cases he or she was selected to hear and there was no pecuniary conflict of interest. I cannot imagine, for example, that my colleagues would defend the constitutionality of a rule or statute permitting an interested party in cases such as this (or in any case) to decide which of the 28 superior court judges in San Francisco will preside over the proceedings and decide the matter, even though all are competent to do so and facially unbiased, their judgments are subject to review, and their incomes are not determined by the number of cases they hear. Unilateral selection of the hearing officer by a party to a dispute such as this, in which an important right is at stake, is no less constitutionally objectionable.

The majority seems unwilling to accept the proposition that he who pays the piper can call the tune, merely because the Supreme Court felt it unnecessary to *explicitly* say so in *Chicago Teachers Union*. But the Supreme Court has made that very point in contexts as germane to the present case as *Chicago Teachers Union*.

The seminal case regarding pecuniary conflicts of interest is *Tumey* v. *Ohio, supra*, 273 U.S. 510, which, as will be seen, has been applied in an increasingly expansive manner, so as to embrace administrative proceedings of the sort we confront in this case. In *Tumey* a mayor-judge was paid, in addition to his regular salary, a certain sum in each case in which he found the defendant guilty of a liquor law violation. The court found this a denial of due process: "The mayor received for his fees and costs in the present case $12, and from such costs under the Prohibition Act for seven months he made about $100 a month, in addition to his salary. We cannot regard the prospect of receipt or loss of such an emolument in each case as a minute, remote, trifling or insignificant interest. [¶] . . . There are doubtless mayors who would not allow such a consideration as $12 costs in each case to affect their judgment in it, but the requirement of due process of law in judicial procedure is not satisfied by the argument that men of the highest honor and the greatest self-sacrifice could carry it on without danger of injustice. *Every procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law.*" (*Id.,* at pp. 531-532 [89 L.Ed.2d at p. 758], italics added.)

The "possible temptation" rule announced in *Tumey* was first extended in *Ward* v. *Village of Monroeville* (1972) 409 U.S. 57 [34 L.Ed.2d 267, 93 S.Ct. 80], where the mayor-judge had no direct pecuniary interest, but the fines he levied helped defray the costs of running the village government. A year later the doctrine was applied to a civil administrative proceeding in *Gibson* v. *Berryhill* (1973) 411 U.S. 564 [36 L.Ed.2d 488, 93 S.Ct. 1689], where the *indirect* economic self-interest of members of a state board of optometry was deemed to offend the due process clause. As stated by the Supreme Court in *Berryhill*, "[i]t is sufficiently clear from our cases that those with substantial pecuniary interest in legal proceedings should not adjudicate these disputes. *Tumey* v. *Ohio*, 273 U.S. 510 [71 L.Ed. 749, 47 S.Ct. 437, 50 A.L.R. 1243] (1927). And *Ward* v. *Village of Monroeville,* 409 U.S. 57 [34 L.Ed.2d 267, 93 S.Ct. 80] (1972) indicates that the financial stake need not be as direct or positive as it appeared to be in *Tumey*. It has also come to be the prevailing view that '[m]ost of the law concerning disqualification because of interest applies with equal force to . . . administrative adjudicators.' K. Davis, Administrative Law Text § 12.04, p. 250 (1972), and cases cited." (*Gibson* v. *Berryhill, supra,* 411 U.S. at p. 579 [36 L.Ed.2d at p. 500].)

California courts have applied the *Tumey* doctrine in administrative proceedings comparable to that before us. (See, e.g., *Applebaum* v. *Board of Directors* (1980) 104 Cal.App.3d 648 [163 Cal.Rptr. 831]; *American Motors Sales Corp.* v. *New Motor Vehicle Bd.* (1977) 69 Cal.App.3d 983 [138 Cal.Rptr. 594].)

The fact that the income of hearing officers depends on the number of cases they hear and therefore the favor of the employers who select them presents a pecuniary conflict of interest at least as clear as those condemned in *Tumey* and its progeny. One such case that is particularly on point, because it discusses the manner in which a hearing officer's interest in securing future judicial business creates a pecuniary conflict, is the decision of the highest court of West Virginia in *State* ex rel. *Shrewsbury* v. *Poteet* (1974) 157 W.Va. 540 [202 S.E.2d 628, 72 A.L.R.3d 368]. There a statutory scheme permitted creditor-plaintiffs a county-wide choice as to judge and provided that the judge selected could charge a $5 fee for his or her services. The court noted that under this fee system "the income of a Justice of the Peace is determined by the number of cases instituted in his court. It necessarily follows that the more cases he handles the more $5.00 fees he will receive." (*Id.,* at p. 631.) Citing *Tumey*, the court noted that in order to make the statute constitutionally invalid it was not necessary to show actual abuse by a particular justice of the peace. (*Id.,* at p. 632) "Although this case is civil rather than criminal, the principle expressed in *Tumey* applies. [The West Virginia statute], wherein it provides that a Justice of the Peace shall

charge and collect a five dollar fee, not only permits but in fact encourages one to favor those who will bring him 'business.' The incentive to increase the number of five dollar fees is built into the statute." (*Ibid.*) Accordingly, without finding any actual bias, the court held that, because it "creates a pecuniary interest in such judicial officers," the statutory scheme violated the Fourteenth Amendment to the United States Constitution as well as the counterpart provision of the West Virginia Constitution.[8]

Justice Haerle consigns his discussion of *Tumey* to a footnote, in which he suggests that the decision in *Aetna Life Insurance Co.* v. *Lavoie* (1986) 475 U.S. 813 [89 L.Ed.2d 823, 106 S.Ct. 1580] has narrowed the *Tumey* doctrine so as to render it inapplicable where, as he claims is the case here, the interest is "speculative and contingent" or "remote and insubstantial." (Lead opn., *ante*, at p. 775, fn. 10.) This tortured reading of *Aetna,* never before advanced by any American court, just cannot be squared with the language of the opinion itself. Actually, *Aetna* defines the rule in *Tumey* in such a way as to confirm its application to this case.

*Aetna* involved a due process challenge to a five-to-four decision of the Alabama Supreme Court which sustained a multimillion dollar punitive damages award against an insurance company for bad faith refusal to pay a valid claim. At the time of the Alabama decision, Justice Embry, the author of the majority opinion, was a party to a class action against Blue Cross posing virtually identical issues. Aetna claimed Justice Embry should have disqualified himself and that his participation violated its rights under the due process clause. The Supreme Court agreed. Noting "that under the Due Process Clause no judge 'can be a judge in his own case [or be] permitted to try cases where he has an interest in the outcome. [Citation.]' " (475 U.S. at p. 822 [89 L.Ed.2d at p. 833], quoting *In re Murchison, supra,* 349 U.S. 133, 136 [99 L.Ed. 942, 946]) the court reiterated the test set forth in *Ward* v. *Monroeville, supra,* 409 U.S. 57, 60 [34 L.Ed.2d 267, 280-271]: a judicial interest is sufficient to disqualify a judge if the " 'situation is one "which would offer a possible temptation to the average . . . judge to . . . lead him not to hold the balance nice, clear and true." ' " (*Aetna Life Insurance Co.* v. *Lavoie, supra,* 475 U.S. at p. 822 [89 L.Ed.2d at p. 833].)

Justice Haerle rejects the use of the "possible temptation" principle because, as he explains, "*Aetna* makes clear that 'possible temptation' clearly does *not* include instances where the interest is 'speculative and contingent." (Lead opn., *ante*, at p. 776, fn. 10, quoting *Aetna Life Insurance Co.* v. *Lavoie, supra,* 475 U.S. at p. 826 [89 L.Ed.2d at p. 836].) This statement,

---

[8]A similar result was reached by the South Carolina Supreme Court in *State* ex rel. *McLeod* v. *Crowe* (1978) 272 S.C. 41 [249 S.E.2d 772].

which is taken completely out of context, is very misleading. The interest held in *Aetna* to be too "speculative and contingent" to create a constitutional problem was not that of Justice Embry but of the other Alabama Supreme Court judges who participated in the case, because "nothing in the record even suggest[ed] that these justices had any knowledge of the class action before the court issued a decision on the merits," and the amount of their individual interests in the victory of the class to which they nominally belonged was infinitesimal. Justice Embry's situation was very different, however. Not only must he have been fully aware that the outcome of the case before him would affect his economic interests, but the amount of his interest was greater than that of ordinary class members because he sought personal compensatory damages in addition to punitive damages in behalf of the class. (*Id.*, at p. 824 [89 L.Ed.2d at p. 834].) Hearing officers selected by employers under Rule 6 must be as aware as Justice Embry was of the effect the outcome of the case before them may have on their future income; and their interest is perhaps even greater than that of Justice Embry, whose base judicial income was never at stake.

The significance of *Aetna*, to which the majority is blind, is its definition of the magnitude of the interest that will suffice to require judicial disqualification under the *Tumey* rule. According to Justice Haerle, *Tumey* and *Ward* v. *Monroeville* "clearly mean that the 'possible temptation mentioned *occurs when* there is a direct, personal, substantial, pecuniary interest' and that the use of the former language does not enlarge the nature of the prohibited interest." (Lead opn., *ante*, at p. 776, fn. 10, italics in original.) Actually, the reverse is true: an interest is "direct, personal, substantial [and ] pecuniary" if it would create a "possible temptation" to be partial to one side.

As the Fifth Circuit has explained, the Supreme Court acknowledged in *Aetna* that " 'what degree or kind of interest is sufficient to disqualify a judge from sitting "cannot be defined with precision" ' [quoting *Aetna Life Insurance Co.* v. *Lavoie, supra,* 475 U.S. at p. 822 (89 L.Ed.2d at pp. 832-833).]" In order to diminish the imprecision, "the *Aetna* court adopted as a 'reasonable formulation' the inquiry whether the 'situation is one "which would offer a possible temptation to the average . . . judge to . . . lead him not to hold the balance nice, clear and true." ' [Citations.] Applying this due process standard to the case before it, the Court concluded that although general allegations of bias and hostility do not rise to a due process violation, the justice's financial stake in the outcome—regardless whether he was in fact impartial—was 'direct, personal, substantial [and] pecuniary' enough to constitute a violation of the Due Process Clause. [Citations.]" (*United States* v. *Couch* (5th Cir. 1990) 896 F.2d 78, 81-82.) In short, *Aetna* posits a "due process standard" that amounts to an objective test: a particular interest

is sufficient to constitutionally disqualify an independent adjudicator when it would "tempt" an "average judge" not to decide the matter before him or her impartially, regardless whether the decisionmaker gave in to the temptation. Justice Haerle is not merely unwilling to acknowledge that this is the "due process standard" upon which the *Tumey* doctrine is based but he invents a different and much higher standard than has ever been applied by the United States Supreme Court or any other court in any relevant case and which guts the due process clause.

## III.

The most important, or "key," reason Justice Haerle refuses to submit to the rationale of *Chicago Teachers Union* is his conclusion that Judge Posner's opinion in that case cannot be squared with pertinent California law regarding the due process requirement of an unbiased hearing officer. (Lead opn., *ante*, at p. 772.) Justice Haerle bases this conclusion on three cases: *Binkley* v. *City of Long Beach* (1993) 16 Cal.App.4th 1795 [20 Cal.Rptr.2d 903] (review den.); *Andrews* v. *Agricultural Labor Relations Bd.* (1981) 28 Cal.3d 781 [171 Cal.Rptr. 590, 623 P.2d 151]; and *Burrell* v. *City of Los Angeles* (1989) 209 Cal.App.3d 568 [257 Cal.Rptr. 427] (review den.). These cases have little or no bearing on the constitutional issue before us.

*Binkley* v. *City of Long Beach, supra,* involved the question whether a city's police chief, who under the city charter could be removed by the city manager without just cause, had been discharged in compliance with the Public Safety Officers Procedural Bill of Rights. Because he could be removed without cause, the police chief *was not constitutionally entitled to a hearing in the first place*; he was afforded a hearing for the limited purpose of enabling him to " 'establish a formal record of the circumstance surrounding his termination' " and thus save face. (16 Cal.App.4th at p. 1809.) The court's holding that the police chief's appeal process was not biased, despite the hearing examiner's appointment by the city manager, must be understood in this light. The court emphasized that, because the city manager was given final decisonmaking authority under the city charter, the right to a fair and impartial tribunal was not violated by permitting the official who makes the initial disciplinary decision to retain the final say in the matter. In the present case the employer does *not* have final decisionmaking authority to hire and fire civil servants; a civil servant cannot be discharged without cause and possesses the right to obtain independent review of the employer's action by an independent hearing officer whose decision, even if it differs from that of the employer, is administratively final. The process whereby the hearing officer is selected, and his or her economic interest in the proceedings, is therefore far more consequential and constitutionally significant than it

would be if, as in *Binkley*, the employee could be terminated without just cause. Furthermore, *Binkley* involved no claim of a pecuniary conflict of interest. As stated by the court, "[t]here is nothing to indicate that [the hearing officer] had a personal or financial stake in the matter . . . ." (*Id.* at p. 1810.)

*Burrell* v. *City of Los Angeles, supra*, 209 Cal.App.3d 568, is also very different from this case. In *Burrell* city employees disciplined by superiors challenged section 112 of the city charter, which limited the ability of the civil service board to reduce the disciplinary penalty by requiring that any reduction in the penalty recommended by the board must be consented to by the same official who originally imposed the discipline. The court upheld the charter provision based on federal cases concluding "that the right to a fair and impartial tribunal is not violated by permitting the official who makes the initial disciplinary decision to have the final say in the matter." (209 Cal.App.3d at p. 579.) *Burrell* has nothing to do with this case even apart from the facts that the employers in that case did not have the unilateral ability to select the persons who reviewed their decisions and there was no pecuniary conflict of interest. Unlike section 112 of the Los Angeles Charter, which gives the employer the final say, section 8.341 of the San Francisco Charter provides not only that the hearing officer who independently reviews the appointing authority's action "may exonerate, suspend or dismiss the accused [employee]" but that, as just noted, "[t]*he finding of the hearing officer shall be final.*" (Italics added.) By ignoring the constitutional requirements implicated by the type of public proceeding contemplated by section 8.341, the majority has in effect imposed upon San Francisco the different civil service system adopted in Los Angeles, which provides its civil servants lesser protections. If this is to be done it can properly be accomplished only through a vote of the citizens of San Francisco, not by fiat of this court.

Justice Haerle's view that *Andrews* v. *Agricultural Labor Relations Bd., supra*, 28 Cal.3d 781 is "controlling" is curious, because that opinion undermines his analysis. In *Andrews* agricultural employers sought to disqualify a temporary hearing officer affiliated with a public interest law firm that regularly represented Spanish-surnamed persons and farm workers against agricultural employers. As Justice Haerle correctly explains, the Supreme Court held that the challenge could not succeed because the employer could not show actual bias, as required by a statute (since repealed) then in effect.[9] (28 Cal.3d at pp. 792-793.) It is important to realize that *Andrews* does not involve a claimed defect in the process for selecting

---

[9]As this court recently pointed out in *Catchpole* v. *Brannon* (1995) 36 Cal.App.4th 237 [42 Cal.Rptr.2d 440] (review den.), California cases—and we specifically referred to *Andrews*—

hearing officers, but rather the actual or apparent bias of the particular hearing officer chosen. Nor does *Andrews* involve the state or federal Constitution. The opinion in that case never once mentions the due process clause or any other constitutional principle; the matter was decided entirely on the basis of statutes that bear very peripherally if at all on the constitutional issue presented in this case. Furthermore, although the opinion does state that a showing of actual bias was ordinarily required by a statute then in effect, the *Andrews* court was careful to carve out an important exception to the actual bias requirement which then prevailed, an exception that clearly describes the present case. "Of course," Justice Mosk observed, "there are some situations in which the probability or likelihood of the existence of actual bias is so great that disqualification of a judicial officer is required to preserve the integrity of the legal system, *even without proof that the judicial officer is actually biased towards a party.*" (*Id.,* at p. 793, fn. 5, italics added.) Justice Mosk then cites *Tumey* v. *Ohio, supra,* 273 U.S. 510, as an example of such a case "in which a judge was disqualified because of his financial stake in the outcome."

Justice Haerle endeavors to evade the caveat in *Andrews* in two ways. First, he suggests there is no pecuniary conflict of interest here because the hearing officer did not have an objectively discernible "financial interest" in a party to the dispute within the meaning of Code of Civil Procedure section 170.5, subdivision (b). But that definition of "financial interest" (which is set forth in the margin below)[10] amounts to a showing of actual bias, which, citing *Tumey,* the *Andrews* court found unnecessary. Justice Haerle then argues that "[i]n the case before us the record does not sustain even an

which stand for the proposition that bias and prejudice are never implied and must be established by clear averments, were "decided under the prior statute governing judicial disqualification—Code of Civil Procedure former section 170, subdivision (a)(5)—which had been construed to require a showing of bias in fact. (See *Andrews* v. *Agricultural Labor Relations Bd.* (1981) 28 Cal.3d 781, 792-793 . . . .) That statute was, however, replaced by section 170.1, subdivision (a)(6)(C) in 1984. The new statute altered the requirement by making the disqualification standard ' "fundamentally an objective one. It represents a legislative judgment that due to the sensitivity of the question and inherent difficulties of proof as well as the importance of public confidence in the judicial system, the issue is not limited to the existence of an actual bias. Rather, if a reasonable man [or woman] would entertain doubts concerning the judge's impartiality, disqualification is mandated. 'To ensure that the proceedings appear to the public to be impartial and hence worthy of their confidence, the situation must be viewed through the eyes of the objective person.' [Citation.]" ' " (*Catchpole, supra,* 36 Cal.App.4th at pp. 245-246, fn. omitted, citing, inter alia, *In re Marriage of Iverson* (1992) 11 Cal.App.4th 1495, 1505 [15 Cal.Rptr.2d 70] (conc. opn. of Moore, J.), quoting *United Farm Workers of America* v. *Superior Court* (1985) 170 Cal.App.3d 97, 104-105 [216 Cal.Rptr. 4], review den.)

[10]I.e., "ownership of more than 1 percent legal or equitable interest in a party, or a legal or equitable interest in a party of a fair market value in excess of one thousand five hundred dollars ($1500), or a relationship as a director, advisor or other active participant in the affairs of a party . . . ." (Code, Civ. Proc. § 170.5, subd. (b).)

'appearance of bias.' If, as noted earlier, appellant had shown how many cases Hearing Officer Wharton had decided, how many of those were for the San Francisco Airport, and how many rulings were in favor of that employer, an objective person might be able to perceive an appearance of bias." (Lead opn., *ante*, at p. 776.) Justice Haerle appears to believe, in other words, that there is no *appearance of bias* in the absence of a showing of *actual bias*. This view is as hard to square with the law as it is with logic.

 *Andrews* would have no application to this case even if the Legislature had not rendered it obsolete (see discussion, *ante*, at fn. 9), because it does not address the constitutional question at issue here (or any federal or state constitutional question).[11] The Supreme Court has left no doubt that it is the appearance of bias that counts, regardless whether actual bias can be shown. As stated in *Marshall* v. *Jerrico, Inc.* (1979) 446 U.S. 238 [64 L.Ed.2d 182, 100 S.Ct. 1610], "[w]e have employed the [*Tumey*] principle in a variety of settings, demonstrating the powerful and independent constitutional interest in fair adjudicative procedure. Indeed, '*justice must satisfy the appearance of justice*,' [citation], and this 'stringent rule may sometimes bar trial by judges *who have no actual bias* and who would do their very best to weigh the scales of justice equally between contending parties,' [citations]." (*Id.* at p. 243 [64 L.Ed.2d at pp. 188-189], italics added, quoting *Offutt* v. *United States* (1954) 348 U.S. 11, 14 [99 L.Ed. 11, 16, 75 S.Ct. 11] and *In re Murchison, supra,* 349 U.S. 133, 136 [93 L.Ed. 942, 946]; see also *Taylor* v. *Hughes* (1974) 418 U.S. 488 [41 L.Ed.2d 897, 94 S.Ct. 2697].) Indeed, in the service of this high principle the Supreme Court has gone so far as to require the disqualification of a judge who at the time he ruled was not even aware of the circumstances that created the appearance of impropriety, and whose decision could therefore not have been affected. (*Liljeberg* v. *Health Services Acquisition Corp.* (1987) 486 U.S. 847 [100 L.Ed.2d 855, 108 S.Ct. 2194].) Indeed, the Supreme Court in that case pointed to its earlier opinion in *Aetna* as an illustration that judicial concern about the appearance of bias "has constitutional dimensions." (*Id.,* at p. 865, fn. 12 [100 L.Ed.2d at p. 875].)

---

[11]The statement in *Burrell* v. *City of Los Angeles, supra,* 209 Cal.App.3d 568 that the Supreme Court in *Andrews* was construing "the state Constitution's due process guaranty of a fair and impartial administrative decisionmaker" (*Id.,* at p. 582), is simply wrong. The *Andrews* opinion, which never mentions the state (or federal) Constitution nor even utters the words "due process," makes no such claim. While I believe *Burrell* is in this respect very misleading, and that *Andrews* has no application to the present case, the opinion in *Burrell* at least acknowledges the exception spelled out in *Andrews*. Thus *Burrell* states that although "mere involvement in ongoing disciplinary proceedings [by the employer whose disciplinary decision is at issue] does not, per se, violate due process principles[,] [t]hose principles *are* violated, conversely, if the official or officials who take part in the proceedings are demonstrably biased *or if, in the least, circumstances such as personal or financial interest strongly suggest a lack of impartiality.*" (*Ibid.,* italics added.) The *Burrell* opinion therefore does not suggest that if the facts of that case were similar to those here the court would take the position adopted by Justice Haerle.

Even though "a person aware of the facts might reasonably entertain a doubt that the [hearing officer in this case] would be able to be impartial"— which is among the grounds for judicial disqualification set forth in the Code of Civil Procedure (Code Civ. Proc., § 170.1, subd. (a)(6)(C))—this is not a conventional disqualification case under that statute, because hearing officers typically selected pursuant to the prescribed process would all be at least tempted to resolve doubts in favor of those who hire and pay them and can do so again in the future. Neither the Code of Civil Procedure nor any other state statute contemplates the sort of systemic due process problem presented in this case. It is the concept of justice embedded in the due process clause of the Fourteenth Amendment that protects appellant and other civil servants in San Francisco.

## IV.

Justice Phelan concurs in Justice Haerle's opinion but, unlike him, believes that the pecuniary conflict of interest has been waived and we should not address it because the issue was not adequately raised below.

It is true, as Justice Phelan points out, that appellant did not in the trial court emphasize as much as he could have the economic incentive for hearing officers to favor the employers who select and pay them. The reason he did not do so was the same reason the Supreme Court did not in *Chicago Teachers Union* think it necessary to comment on the pecuniary conflict of interest spelled out by the Seventh Circuit in that case; the mere fact that an interested party was permitted to unilaterally select the decisionmaker was sufficient to show a due process violation. The economic interest of the arbitrator in *Chicago Teachers Union* and the hearing officer here is simply an exacerbation of this threshold problem. Moreover, the remedy appellant sought below, that no hearing officer be employed without his consent, would have solved *all* the constitutional problems, including the pecuniary conflict of interest, which appellant would be waiving by his consent. Rejecting this request, the superior court found that "the method by which the hearing officer was selected did not violate fundamental notions of due process articulated by *Chicago Teachers Union* v. *Hudson* (1986) 475 U.S. 292 [89 L.Ed.2d 232, 106 S.Ct. 1066]." This ruling was erroneous, as I have said, even without the showing of pecuniary conflict of interest appellant could more clearly have made.

Justice Phelan asserts that the waiver rule is appropriate in this case "because factual issues related to the alleged financial conflict of interest were never developed in the trial court" and "we simply *do not know the* extent of Wharton's alleged financial conflict of interest." (Conc. opn., *ante,*

at p. 778.) He is therefore, in effect, adopting Justice Haerle's erroneous view that a showing of actual bias is necessary.

The undisputed record tells us all we need to know. The San Francisco civil service rules state that the hearing "shall be conducted by a hearing officer under contract to the appointing officer" (Rule 6); that the appointing authority, or employer, may select a hearing officer from virtually any public or private organization that supplies such officers; that the employee may only challenge the employer's choice on the basis of a showing of actual bias, but such a challenge may expose the employee to an expense he would not otherwise bear, and that, in any case, an employer may reject an employee's challenge.

As we must assume hearing officers do not provide their services for free, and that they are paid in the manner prescribed by the charter and civil service rules, the precise amount any hearing officer earns, or other information bearing on the *extent* of his or her conflict of interest need not be shown. As Chief Justice Taft pointed out in *Tumey*, ". . . it is very clear that the *slightest* pecuniary interest of any officer, judicial or quasi-judicial, in the resolving of the subject matter which he was to decide," renders his or her "decision voidable. [Citations.]" (*Tumey* v. *Ohio, supra*, 273 U.S. at p. 524 [71 L.Ed.2d at p. 755], italics added.) "There was at the common law the greatest sensitiv[ity] over the existence of *any* pecuniary interest, *however small or infinitesimal*, in the justices of the peace." (*Id.*, at p. 525 [71 L.Ed.2d at p. 755], italics added.) Furthermore, it was not the actual receipt of a fee that created the due process problem in *Tumey*, but the mere "prospect of receipt or loss of such an emolument" (*Id.*, at p. 532 [71 L.Ed.2d at p. 758]) because it created "a *possible temptation* to the average man as a judge to forget the burden of proof . . . or which *might* lead him not to hold the balance nice, clear and true" between the parties. (*Ibid.*, italics added) The court was therefore indisposed to treat the possibility of a $12 fee "as a minute, remote, trifling or insignificant interest." (*Ibid.*)

In short, it is not important how much Hearing Officer Wharton is paid for his services, or whether he has in the past ruled for or against those who employ and pay him, or what percentage of his income may in the past have derived from selection as a hearing officer to adjudicate civil service cases under Rule 6, and the absence from the record of information such as this does not matter. What matters is whether the interest of the "average" hearing officer in cases arising under Rule 6 would be subject to the "possible temptation" described in *Tumey* and repeatedly reaffirmed by the Supreme Court. As in *Tumey*, this temptation does not arise because of anything that may be unique to Hearing Officer Wharton "but was the result

of the normal operation of the law and the ordinance." (273 U.S. at p. 523 [71 L.Ed.2d at p. 754].) Nor can a hearing officer's interest in increasing his or her future judicial business and income reasonably be considered a "slight" interest, as my colleagues claim. Accordingly, this court knows all it needs to know to appropriately adjudicate the merits of this case.

For the foregoing reasons, I would reverse the judgment.

Appellant's petition for review by the Supreme Court was denied May 1, 1996. Mosk, J., was of the opinion that the petition should be granted.