[No. E030224. Fourth Dist., Div. Two. June 26, 2002.]

DEPARTMENT OF ALCOHOLIC BEVERAGE CONTROL, Petitioner, v. ALCOHOLIC BEVERAGE CONTROL APPEALS BOARD, Respondent; RENEE VICARY, Real Party in Interest.

882

**COUNSEL**

Bill Lockyer, Attorney General, Dennis W. Dawson and Chris A. Knudsen, Deputy Attorneys General, for Petitioner.

No appearance for Respondent.

Roger Jon Diamond for Real Party in Interest.

## OPINION

**HOLLENHORST, Acting P. J.**—Real party in interest Renee Vicary (Vicary) is the proprietor of Angels Sports Bar, which offers topless entertainment. The bar is licensed to serve alcoholic beverages and accordingly is supervised by petitioner Department of Alcoholic Beverage Control (Department). During an investigation, Department investigators observed dancers employed by Vicary at the bar touching and fondling their bare breasts during dances. Other dancers were observed exposing one or more breasts while sitting or standing within six feet of patrons.

The Department thereafter filed an accusation alleging that Vicary's employees had seven times violated title 4, section 143.3, subdivision (1)(b) ("touching, caressing or fondling of the breast, buttocks, anus or genitals") of the California Code of Regulations,[1] and had once violated title 4, section 143.3, subdivision (2) of the California Code of Regulations, which prohibits the exposure of breast or buttock unless the dancer is on a raised stage at least six feet from patrons.

At the scheduled hearing, Vicary first raised a constitutional challenge to the power of the administrative law judge (ALJ), an employee of the Department, to hear the case. This challenge was rejected and the hearing proceeded. The ALJ sustained all counts of the accusation and a license suspension of 30 days was imposed. Vicary duly appealed. (Cal. Const., art. XX, § 22; Bus. & Prof. Code, § 23081.) The Alcoholic Beverage Control Appeals Board (Board) reversed the decision of the ALJ not on factual grounds, but on the basis that Rule 143.3 could not be constitutionally applied to the arguably "expressive" conduct of the dancers. The Department sought judicial review from this court. (Bus. & Prof. Code, § 23090.) We issued a writ of review, and now annul the decision of the Board.

### DISCUSSION

#### A.

We first address the threshold issue of the ALJ's legal power and the propriety of his employment as a decision maker. Vicary argues that he was not selected in conformity with the Administrative Procedures Act,

---

[1] In accordance with the practice of the parties, we will refer to this regulation as "Rule 143.3."

specifically Government Code section 11502;[2] further, that because he was an employee of the Department, his implicit bias deprived her of due process. Neither contention has merit.

Section 11502, subdivision (a), provides that "[a]ll hearings of state agencies required to be conducted under this chapter shall be conducted by administrative law judges on the staff of the Office of Administrative Hearings." However, subdivision (a) of section 11501 qualifies this requirement by stating: "This chapter applies to any agency *as determined by the statutes relating to that agency.*" (Italics added.) Here, the ALJ acted under the authority of Business and Professions Code section 24210, which provides in subdivision (a) that "[t]he department may delegate the power to hear and decide to an administrative law judge appointed by the director." As petitioner points out, this statute was amended in 1994 to delete the existing provision that matters be heard pursuant to the Administrative Procedures Act statutes, and instead to empower the director of the Department to appoint ALJ's. Furthermore, sections 11415.10 and 11415.20 clearly confirm that "[t]he governing procedure by which an agency conducts an adjudicative proceeding is determined by the statutes and regulations applicable to that proceeding," and that "[a] state statute . . . applicable to a particular agency . . . prevails over a conflicting or inconsistent provision of this chapter."[3] ■ These provisions make explicit the applicability of the rule that where two statutes consider the same subject matter, the more specific prevails over the more general. (*San Francisco Taxpayers Assn. v. Board of Supervisors* (1992) 2 Cal.4th 571, 577 [7 Cal.Rptr.2d 245, 828 P.2d 147].)[4]

■ Vicary's assertion that Business and Professions Code section 24210 merely authorizes the director of the Department to select an ALJ from the staff of the Office of Administrative Hearings to hear a particular case is without merit. This was the procedure under the *previous* version of

[2]All further statutory references will be to the Government Code unless otherwise indicated.

[3]Section 11415.10 goes on to further clarify, if further clarification is needed, that "[i]f no other governing procedure is provided by statute or regulation, an agency may conduct an adjudicative proceeding under the administrative adjudication provisions of the Administrative Procedure Act."

[4]It is true that the principle only applies if the two statutes cannot be reconciled. (*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 478 [66 Cal.Rptr.2d 319, 940 P.2d 906].) However, Business and Professions Code section 24210, which allows the director to appoint ALJ's, cannot be reconciled with Government Code section 11502's requirement that administrative hearings be held before an ALJ on the staff of the Office of Administrative Hearings. Thus, the rule cited in *San Francisco Taxpayers Assn. v. Board of Supervisors, supra,* 2 Cal.4th at page 577, applies.

the statute, and its express references back to the Administrative Procedures Act. The new version must have been designed to accomplish some alteration in procedure; to construe substantial changes in language as effecting no change would be absurd. We think it obvious that the intended change was to permit the director to establish a staff of Department ALJ's.[5] The new version provides that the Department may delegate its powers to an ALJ "appointed by the director," and in the context of state employment, "appointed" is frequently equivalent to "hired." (See § 18525.) We think it plain that the Department is authorized to hire and use its own ALJ's rather than to use those selected and employed by the Office of Administrative Hearings.

Vicary's second argument raises the issue of due process, which of course includes the right to an impartial decision maker. (*Hall v. Harker* (1999) 69 Cal.App.4th 836, 841 [82 Cal.Rptr.2d 44].)  ▮  Due process applies to administrative proceedings as well as to judicial proceedings. (*Burrell v. City of Los Angeles* (1989) 209 Cal.App.3d 568, 582 [257 Cal.Rptr. 427].) However, at least in the administrative context, all that is required is that the hearing officer or other decision maker be a " '*reasonably* impartial, noninvolved reviewer.' " (*Linney v. Turpen* (1996) 42 Cal.App.4th 763, 771 [49 Cal.Rptr.2d 813] (*Linney*).)

▮  Vicary's position is that because the ALJ was employed by the Department, he necessarily had a bias in favor of the Department, which would be prompted by a perceived need to please the Department in order to keep his job. We recognize that no showing of *actual* bias is necessary if the challenged adjudicator has a strong, direct financial interest in the outcome. (*Haas v. County of San Bernardino* (2002) 27 Cal.4th 1017, 1032-1034 [119 Cal.Rptr.2d 341, 45 P.3d 280] (*Haas*).) However, it has been consistently recognized that the fact that the agency or entity holding the hearing also

---

[5]The Department's position is supported by legislative history. (See Legis. Counsel's Dig., Assem. Bill No. 463 (1994-1995 Reg. Sess.); Sen. Com. on Governmental Organization, Analysis of Assem. Bill No. 463 (1994-1995 Reg. Sess.) p. 2.)

On the other hand, Vicary attempts to make much of the fact that certain statutes authorizing *other* agencies to appoint their own employees as hearing officers include an express requirement that the officers be "impartial." (See, e.g., Lab. Code, § 1742, subd. (b); Unemp. Ins. Code, § 404.) Vicary argues that the omission of this word from Business and Professions Code section 24210 can only be explained by the fact that the section really requires the use of ALJ's from the Office of Administrative Hearings, who are *presumptively* impartial. As noted below, it is not self-evident that such ALJ's would be more impartial than Department ALJ's. We think that the drafters of the cited statutes included the requirement that the hearing officer be "impartial" simply as a matter of course, and that the omission of the term in the Business and Professions Code statute gives rise to no persuasive inference. What the cited statutes *do* demonstrate is that it is not at all unique for the Legislature to provide for a state agency's use of "in-house" ALJ's.

pays the adjudicator does not automatically require disqualification (see *McIntyre v. Santa Barbara County Employees' Retirement System* (2001) 91 Cal.App.4th 730, 735 [110 Cal.Rptr.2d 565]; *Linney, supra,* 42 Cal.App.4th at pp. 770-771), and *Haas* confirms this. (*Haas, supra,* 27 Cal.4th at p. 1031.) As the Supreme Court also noted in *Haas,* such a rule would make it difficult or impossible for the government to provide hearings which it is constitutionally required to hold.

*Haas* involved a county that had no regular "hearing officer," but simply hired attorneys to serve on an ad hoc basis. The vice of the system was that an attorney who desired future appointments had a financial stake in pleasing the county, and that the county had almost unrestricted choice for future appointments. In this case, ALJ's are protected by civil service laws against arbitrary or retaliatory dismissal. (See § 18500 et seq.) Thus, there is no basis upon which to conclude that the ALJ was influenced to rule in favor of the Department by a desire for continued employment.

As the court noted in *Linney,* current law also authorizes disqualification if the circumstances would lead a reasonable person to suspect bias. (Code Civ. Proc., § 170.1, subd. (a)(6); *Linney, supra,* 42 Cal.App.4th at p. 776.) Given that the ALJ's financial interest in the result is too attenuated to require disqualification without a showing of actual bias, we find Vicary's other speculative and factually bare concerns about the ALJ's presumed "coziness" with the Department insufficient to raise a suspicion of bias.[6] The record contains no information on the manner in which an ALJ is selected by the Department for any given hearing which would suggest any possibility of bias. Finally, although Vicary insists that the Department should employ ALJ's provided by the Office of Administrative Hearings—that is, by the state—it is speculative to state that such ALJ's would be "more impartial" than those employed directly by a particular agency. We will not presume that state-employed professional ALJ's cannot, will not, or do not bring a constitutional level of impartiality to the cases they hear, even if one side is the agency that directly employs them. The procedure here was constitutionally permissible.

---

[6]We note that under Vicary's theory, members of the Board could be similarly challenged, as they are subject to—or "fearful of"—removal by the Governor at his pleasure, or by majority vote of the Legislature for dereliction of duty, corruption, or incompetence. (Cal. Const., art. XX, § 22.) Furthermore, they are just as likely to be "cozy" with the Department enforcement personnel as are the ALJ's. Such an approach to disqualification, however, would essentially prevent the government from ever holding hearings on matters of public importance.

## B.

We turn now to the substance of the case and the continuing viability of Rule 143.3. In our view, the Board erred in underestimating the state's power to impose regulations directed at the undesirable secondary effects of certain types of entertainment and the establishments offering them. Furthermore, the Board failed to give adequate consideration to the rule that reasonable restrictions on the time, place, and manner of expression may be constitutionally valid. Finally, we reject any reliance by the Board on an alleged de minimis theory.[7]

It has long been recognized that "there is no inherent right to sell intoxicating liquors, that the liquor business is fraught with danger to the community, and [that it] may therefore be either entirely prohibited, or permitted under such conditions as are prescribed by the regulatory agency." (*Yu v. Alcoholic Bev. etc. Appeals Bd.* (1992) 3 Cal.App.4th 286, 296 [4 Cal.Rptr.2d 280].) Once granted, a license may be revoked or suspended for the protection of the public welfare and morals. (Cal. Const., art. XX, § 22; *Harris v. Alcoholic Bev. Con. Appeals Bd.* (1963) 212 Cal.App.2d 106 [28 Cal.Rptr. 74].) Thus, the state may properly regulate establishments which sell alcoholic beverages to patrons to protect the public interest in a safe and relatively seemly environment.

In *California v. LaRue* (1972) 409 U.S. 109 [93 S.Ct. 390, 34 L.Ed.2d 342] (*LaRue*), the Supreme Court upheld the essential validity of Rule 143.3. In part, the court relied on the authority given to the states by the Twenty-first Amendment.[8] However, it also noted that Rule 143.3 constituted at most a minimal infringement on true expressive conduct. Acknowledging that the regulation would affect some conduct protected by the First Amendment, the court stated that "the critical fact is that California has not

[7]At oral argument, Vicary complained that our tentative opinion focused on the "facial validity" of Rule 143.3, while her attack was primarily on the *application* of the rule. While this is true, we take this approach because the Board's opinion can be read as reflecting the belief that *nonobscene* conduct cannot be regulated by the state even in conjunction with the sale of alcoholic beverages. The Board's lengthy discussion of what it referred to as the "continually evolving and highly controversial area of the law" and the underlying constitutional principles strongly suggested to us that it believed the rule to have been undermined by recent cases. The Department's concern, in its petition, to affirm the validity of the rule indicates that its reading of the Board's decision was similar to ours. Accordingly, we address these issues at some length for the guidance of the Board.

[8]In addition to repealing Prohibition (U.S. Const., 18th Amend.), the Twenty-first Amendment, section 2 provides: "The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited."

forbidden these performances[9] across the board. It has merely proscribed such performances in establishments that it licenses to sell liquor by the drink." (*LaRue, supra,* 409 U.S. at p. 118 [93 S.Ct. at p. 397].) ▮▮▮▮ The court further took note that the adoption of Rule 143.3 was based on substantial evidence that nude performances in conjunction with the sale of liquor led not only to lewd conduct by customers inside the business premises, but also to prostitution, indecent exposure, and sexual assault in the vicinity.[10] ▮▮ As is still broadly recognized today: "Liquor and sex are an explosive combination." (*Blue Canary Corp. v. City of Milwaukee* (7th Cir. 2001) 251 F.3d 1121, 1124 (*Blue Canary*).) Although Vicary denies that the government has any interest in regulating the effect of speech on the listener, these cases also establish that in the limited context of liquor regulation, such an interest not only exists, but can be a proper exercise of the police power.

Several years later, a California court relied on *LaRue*'s approval of Rule 143.3 to uphold the granting of injunctive relief against an establishment that proposed to offer alcoholic beverages and "entertainment" which would concededly violate Rule 143.3. (*Stroh v. Midway Restaurant Systems, Inc.* (1986) 180 Cal.App.3d 1040, 1053-1054 [226 Cal.Rptr. 153].) Our Supreme Court also cited *LaRue* in discussing and distinguishing an ordinance whose prohibition of nude dancing extended *beyond* establishments offering alcoholic beverages. (*Morris v. Municipal Court* (1982) 32 Cal.3d 553, 560 [186 Cal.Rptr. 494, 652 P.2d 51].) Thus, the validity of Rule 143.3 would appear to be well established.

However, the Board concluded that more recent decisions from the United States Supreme Court undermined the authority of *LaRue* in crucial respects. As we will explain, this conclusion was wrong.

The Board relied on *44 Liquormart, Inc. v. Rhode Island* (1996) 517 U.S. 484 [116 S.Ct. 1495, 134 L.Ed.2d 711] (*44 Liquormart*), in which the court retreated from the *LaRue* court's reliance on the Twenty-first Amendment as

---

[9]E.g., "performances" featuring sodomy, flagellation, and bestiality, as well as the tamer type of touchings involved here.

[10]A governmental unit need not conduct its own study regarding these effects, but may rely on evidence " 'already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses.' " (*BZAPS, Inc. v. City of Mankato* (8th Cir. 2001) 268 F.3d 603, 606; see also *City of Renton v. Playtime Theatres, Inc.* (1986) 475 U.S. 41, 51 [106 S.Ct. 925, 930-931, 89 L.Ed.2d 29].) In this case, the Department did conduct certain studies before adopting the rule, and there is no evidence in the record that things have changed. Information from other jurisdictions, gleaned from reported cases, confirms that establishments offering both alcohol and "adult entertainment" still tend to attract both crime and disorderly behavior.

conferring an added presumption of validity upon alcohol-related regulation of expressive conduct. Instead, the court held that the Twenty-first Amendment did not qualify or diminish the states' obligations to respect the First Amendment. (*44 Liquormart, supra,* 517 U.S. at pp. 515-516 [116 S.Ct. at pp. 1514-1515].)

*44 Liquormart,* however, was not a dancing-in-bars case, but rather involved Rhode Island's attempt to impose a total prohibition on the advertising of alcoholic beverages. The bulk of the discussion involves the regulation of commercial speech in general. Although the state's attempt to rely on *LaRue*'s gloss of the Twenty-first Amendment led to the retrenchment discussed above, the Supreme Court also commented: "We are now persuaded that the Court's analysis in *LaRue* would have led to precisely the same result if it had placed no reliance on the Twenty-first Amendment. [¶] *Entirely apart* from the Twenty-first Amendment, the State has *ample power* to prohibit the sale of alcoholic beverages in inappropriate locations." (*44 Liquormart, supra,* 517 U.S. at p. 515 [116 S.Ct. at p. 1514], italics added.)[11]

In other words, the Supreme Court in *44 Liquormart* stated that *LaRue* was correctly decided, that is, that the Department's adoption of Rule 143.3 was constitutionally permissible even though the buttress of the Twenty-first Amendment had been removed. Other courts have concluded that *44 Liquormart* does not obliterate the states' powers to regulate the combination of alcohol and expressive conduct. (E.g., *BZAPS, Inc. v. City of Mankato, supra,* 268 F.3d at p. 608; *El Marocco Club, Inc. v. Richardson* (R.I. 2000) 746 A.2d 1228.)

Confirming this view is the high court's opinion in a case decided after *44 Liquormart, Erie v. Pap's A.M.* (2000) 529 U.S. 277 [120 S.Ct. 1382, 146 L.Ed.2d 265] (*Pap's A.M.*).[12] In *Pap's A.M.,* the challenged local ordinance banned *all* public nudity, and the challenge was brought by an establishment which wished to present nude dancing. For our purposes, the case makes two significant points: (1) Although nude dancing is covered by the First Amendment, it falls "only within the outer ambit" of protection (*Pap's A.M., supra,* 529 U.S. at p. 289 [120 S.Ct. at p. 1391]; see also *Barnes v. Glen Theatre, Inc.* (1991) 501 U.S. 560, 565-566 [111 S.Ct. 2456, 2459-2460, 115 L.Ed.2d 504]); and (2) if a regulation is directed at genuine "secondary effects" of the

---

[11]The power to which reference is made is, of course, the police power. (See generally *Berman v. Parker* (1954) 348 U.S. 26, 32-33 [75 S.Ct. 98, 102-103, 99 L.Ed. 27].) The California Constitution also contains a specific grant of regulatory power relating to alcoholic beverages in article XX, section 22.

[12]The Board was aware of the *Pap's A.M.* decision, but believed that it did not provide a "clear answer" to the questions in this case.

regulated conduct, the regulation should be deemed "content neutral" for the purpose of determining the level of scrutiny.[13] (*Pap's A.M., supra,* 529 U.S. at pp. 292-296 [120 S.Ct. at pp. 1392-1395].)

The seminal content-neutral case, in turn, is *United States v. O'Brien* (1968) 391 U.S. 367 [88 S.Ct. 1673, 20 L.Ed.2d 672] (*O'Brien*), which arose out of the burning of a draft card allegedly with the expressive intent of protesting the Vietnam conflict. As the court explained in *Pap's A.M.,* in *O'Brien,* the statute prohibiting such destruction was "aimed at maintaining the integrity of the Selective Service System and not at suppressing the message of draft resistance . . . ." (*Pap's A.M., supra,* 529 U.S. at p. 291 [120 S.Ct. at p. 1392].) Such a statute was, and is, subject to an intermediate level of scrutiny which focuses on four factors: (1) Is the regulation within the power of the government to enact? (2) Does it further an important or substantial governmental interest? (3) Is the governmental interest unrelated to the suppression of free expression? (4) Is the restriction no greater than is essential to the furtherance of the governmental interest? (*Id.* at pp. 296-301 [120 S.Ct. at pp. 1394-1397].)

Even if the legal analysis of *LaRue* were no longer available to support Rule 143.3, an analysis under *Pap's A.M.* and *O'Brien* would be appropriate and would lead to the same result. As *Pap's A.M.* confirms, the state is authorized under the police power to enact regulations affecting public health and morality. (*Pap's A.M., supra,* 529 U.S. at. p. 296 [120 S.Ct. at pp. 1394-1395].) As *LaRue* also recognized, the adoption of Rule 143.3 was supported by ample evidence of the deleterious effects inherent in the combination of alcoholic beverages and explicitly erotic performances.[14] Regulation of the performances will therefore logically reduce the negative secondary effects and thus further the governmental interest. (See *Pap's A.M., supra,* 529 U.S. at pp. 300-301 [120 S.Ct. at pp. 1396-1397].) Turning

---

[13]To give a concrete example, a rule barring a dancer from "snapping" her breast by pulling on a ring attached to it (as was done by one of the dancers here) is content neutral because the dancer could intend to express any number of views, opinions, feelings, invitations, et cetera. The regulation is not concerned with the intended content of the "snapping."

Vicary argues strenuously that because Rule 143.3 is directed towards performances rather than the state of nudity, it is content directed and unconstitutional, thus attempting to distinguish *Pap's A.M.* However, even a case cited by Vicary recognizes that in the context of "adult entertainment," arguably content-directed regulations are commonly analyzed as content neutral if they can be *justified* without reference to content. (*Schultz v. City of Cumberland* (7th Cir. 2000) 228 F.3d 831, 845 (*Schultz*).)

[14]Furthermore, at this point in time, courts are generally willing to accept the existence of negative "secondary effects" either as a matter of "common sense" or through reliance on reports from other jurisdictions. (See *Sammy's of Mobile, Ltd. v. City of Mobile* (11th Cir. 1998) 140 F.3d 993, 997.)

to the third *O'Brien* factor, the governmental interest is not related to the suppression of any particular expression or expression in general. Finally, as was noted in *Pap's A.M.*, Rule 143.3 "regulates conduct, and any incidental impact on the expressive element of nude dancing is *de minimis*." (*Pap's A.M.*, at p. 301 [120 S.Ct. at p. 1397], original italics.)[15]

Hence, in our view the latest pronouncements of the United States Supreme Court tend to confirm, rather than undercut, the validity of Rule 143.3. The Board incorrectly found otherwise.

First, the Board distinguished *Pap's A.M.* by noting that it involved a total ban on public nudity, while Rule 143.3 regulates the conduct of a dancer who may be clothed. We do not see a great deal of significance to this. Secondly, the Board believed that "by singling out specific elements of conduct, devoid of context, [Rule 143.3] threatens to inhibit expression more than a minimal amount."[16]

However, to the extent that a ban on self-touching limits expression more than a requirement of pasties and G-strings, the Board has failed to give adequate weight to the fact that Rule 143.3 operates only in the field of licensed premises. As the Department points out, Rule 143.3 can also be fairly characterized as a "time, place, and manner" restriction. (See *City of Renton v. Playtime Theatres, Inc., supra*, 475 U.S. 41, 46 [106 S.Ct. 925, 928].) The Department is not attempting to regulate or prohibit nude or erotic dancing in general. It is only attempting to reduce the problems caused by such dancing in front of customers whose inhibitions and ability to control their impulses have been weakened by the consumption of liquor. If performers at Vicary's establishment feel constricted by Rule 143.3, they are free to exhibit their wares (and whatever else they wish) at clubs which do not serve alcoholic beverages. The *location-limited* effect of Rule 143.3 was cited as the "critical fact" favoring a finding of constitutional validity in

---

[15]Justice Scalia, concurring in the judgment, and Justice Stevens, dissenting, commented that the requirement of pasties and G-strings would not be likely to substantially reduce the negative secondary effects. The court—via Justice O'Connor's plurality opinion—agreed that while a requirement that "erotic" dancers be fully clothed would probably be more effective, the fact that the City of Erie chose to experiment with a less drastic restriction could not be considered a factor invalidating the regulation.

[16]In this respect it also felt that because the Department "has culled touches which lasted only seconds" from some 48 minutes of dance, "it is inescapable that the content of the expression is what the Department found to be offensive." Not so; what the Department found offensive was the specific conduct that violated Rule 143.3. Contrary to the Board's view, we think it extremely unlikely that these isolated bits of conduct were uniquely expressive or essential to the message—if any, as Justice Scalia would probably remark—of the dances. (See *Pap's A.M., supra*, 529 U.S. at p. 310 [120 S.Ct. at p. 1402] (conc. opn. of Scalia, J.).)

*LaRue, supra,* 409 U.S. at page 118 [93 S.Ct. at page 397]. If it is supported by substantial governmental concerns, a regulation touching on expression is nevertheless valid so long as "reasonable alternative avenues of communication" remain.[17] (*City of Renton v. Playtime Theatres, Inc., supra,* 475 U.S. at p. 50 [106 S.Ct. at p. 930].) Such alternatives remain available here.

In our view, nothing in the subsequent decisions rendered by the high court affects this point as applied to the case at bar. We have considered a case cited by Vicary, *Schultz, supra,* 228 F.3d 831, in which the court did express the view that regulation of the dancers' sexually oriented self-touching gestures constituted an impermissible burden on expression. (*Id.* at p. 845.) Assuming this view is correct, *Schultz* is not controlling because it did not involve the combination of alcohol and sexually suggestive performance; the establishment in question did not serve liquor. Furthermore, *Schultz* involved a total ban on nude dancing and specified sexual gestures, so that no "time, place, and manner" analysis could be applied. On the other hand, in *Blue Canary, supra,* 251 F.3d at page 1124, the court had no difficulty upholding what was essentially a zoning regulation because "[the expression is] not suppressed but merely shoved off to another part of town."[18]

We are also unpersuaded that the decision in *LSO, Ltd. v. Stroh* (9th Cir. 2000) 205 F.3d 1146 requires that Rule 143.3 be struck down. In that case, which involves what the Department now admits was a "mistake,"[19] an organization proposed to hold a sort of trade show that would include a display of erotic art and photographs. The show was to be held at a large convention center that held a liquor license. Relying on title 4, section 143.4 of the California Code of Regulations,[20] the Board warned the convention center that its license would be revoked if it permitted the exhibition to open—despite the trade show's offer to declare an "alcohol free zone" and to sell no alcohol in the portion of the center containing the show. (*LSO, Ltd. v. Stroh, supra,* 205 F.3d at p. 1151.)

---

[17] That is, avenues for the same type of expression.

[18] The *Blue Canary* court, in a typically stylish and forthright opinion by Judge Posner, also described the "impairment of First Amendment values" as "slight to the point of being risible . . . ." (*Blue Canary, supra,* 251 F.3d at p. 1124.)

[19] In her return, Vicary requested that we ask the Department, at oral argument, whether it believed that Rule 143.3 would apply to prohibit an actress at the Mark Taper Forum Theatre in Los Angeles from touching her breasts through her clothing. It is obvious from the Department's characterization of its actions in *LSO, Ltd. v. Stroh,* that the answer would be "no."

[20] This rule is very similar to Rule 143.3, except that it regulates the display of art, films, etc., in licensed premises.

It is obvious that this is exactly the sort of heavy-footed attempt to regulate fully protected expression that the Supreme Court, in *LaRue*, suggested might present itself in the future, although it was *not* presented in that case. (*LaRue, supra,* 409 U.S. at p. 119, fn. 5 [93 S.Ct. at p. 397].) Insofar as the Ninth Circuit Court of Appeals expressed doubts about the continuing viability of *LaRue*, as we have explained, we do not share them. It may well be true that Rule 143.3 could not be constitutionally applied to a reasonably high-minded display of serious artistic material in conjunction with alcohol, but that is not this case. As the cases reiterate, erotic dancing is not entitled to the same protection as Shakespeare's Hamlet.[21]

The Board was also concerned that the Department's actions were motivated "by what it perceives as the primary effects of the expression, i.e., the effect on the audience—'sexual arousal.' " Coupled with this was a criticism that there had been no finding that the touchings were "not part of the expressive element of the dance," and no attempt to "assess the impact the prohibition might have had upon the expression reflected in the dance." Of course the Department, and Rule 143.3, are indirectly concerned with the arousing effects of the prohibited conduct; that is not disputed. We may also assume, arguendo, that a dancer's expression of sensual emotion may be impaired if she cannot fondle her breasts or genitals. However, if expression tends to create deleterious secondary effects—here, immoral or unlawful actions by the viewers—*Pap's A.M.* confirms that some regulation of the expression is permitted; the hands of the state are not constitutionally bound. And although Rule 143.3 may reach more broadly than would be permissible for a regulation of conduct in *all* places, it is properly applied to regulate the "explosive" combination of liquor and sex. (See *Blue Canary, supra,* 251 F.3d at p. 1124.)

Vicary strenuously argues in line with the decision of the Board that the touchings involved should be viewed as integral parts of the artistic expression and therefore protected. She concedes that "prolonged" touching for "no artistic purpose" would violate Rule 143.3, but insists that this is a different case and that it is unconstitutional to forbid "brief" touchings in the context

---

[21]We use the example, because the Department suggests that a licensed bar could not circumvent Rule 143.3 by having a performer recite "the soliloquy from Hamlet while fondling her breasts or genitalia." We are not sure this is a correct statement. A performance of Hamlet in which the performer playing Ophelia fondled herself while nude during the "mad scene" would be artistically viable (and has probably been done). For example, Ophelia's songs include the lyrics "Then up he rose, and donn'd his clothes; And dupp'd the chamber-door; Let in the maid, that out a maid; Never departed more." (Shakespeare, Hamlet, act IV, scene 5.)

of expressive dance. Instead, she suggests that the Board (and this court) must evaluate each touching.[22]

We disagree. The prohibition of Rule 143.3 is clear and the touchings here were not inadvertent. We decline to hold that the minimal constitutional protection to which the dancers are entitled requires that they be permitted one or more "freebies." Furthermore, Vicary, and the dancers, cannot have it both ways. If the touchings were truly insignificant, there is a similarly insignificant effect on expression if the touchings are banned. On the other hand, if the touchings were the highlight of erotic expression, they were likely to spark exactly those reactions in the customer which Rule 143.3 properly attempts to prevent.[23]

Although Vicary argued at the hearing that her dancers were on the more protected part of the continuum running from Pavlova and Baryshnikov at the one end, to live-sex-on-stage performers at the other, experience indicates otherwise.[24] The record indicates only that the dancers performed to brief recorded songs, during which they typically removed their tops and, prompting this case, frequently caressed their breasts. Common sense—and the assumption underlies dozens of cases—suggests that gentlemen do not go to topless bars to see Swan Lake or even Twyla Tharp, and that a topless establishment that hoped to be successful would not offer such fare. While we agree that the conduct involved does not approach that cited in *LaRue* (see fn. 9, *ante*), we decline to hold that a state may prohibit performers from having sex with animals in bars, but must permit female dancers to rub their genitals and snap their bare breasts at the customers.[25] In terms of the potential for negative secondary effects, the distinction is one of degree and is not significant.

---

[22]The standards for evaluating the proposed touchings would presumably include both duration and the intended expression or content.

[23]Of course, if the touchings were unrelated to any expression at all, they could be regulated, as even Vicary concedes.

[24]Vicary requests that we take judicial notice of the fact that singer Michael Jackson frequently grabs his crotch during performances. In the same spirit, it is not unfair for us to rely on other than direct experience in characterizing the typical topless dances performed in bars.

We note that at oral argument, Vicary appeared to take the position that there was no "continuum" supporting a varying application of the First Amendment. We believe that the United States Supreme Court has clearly recognized that the constitutional protection varies with the type of speech, and that it lightens (but does not dissipate) near the "outer ambit" in which Vicary's dancers operate. (See *Pap's A.M.*, *supra*, 529 U.S. at p. 289 [120 S.Ct. at p. 1391].)

[25]Vicary argued strenuously at oral argument that the rule was not violated when the dancer "Pamela" manipulated her bare breasts by pulling on an implanted ring. The evidence also showed that "Pamela" violated the rule by flesh-to-flesh touchings as well. We find no need at this point to determine whether such a ring should be considered a "fixture" and part of the

Agreed, dancers of this sort are entitled to at least some First Amendment protection. However, they are not entitled to flout rules enacted in the hope of maintaining some level of decorum in the potentially inebriated patrons, not only while on the premises, but after they leave. The state, through the Department, has not prohibited dancers from performing with the utmost level of erotic expression. They are simply forbidden to do so in establishments that serve alcohol, and the Constitution is not thereby offended.

It remains to consider whether Vicary should be given the opportunity to request the Board to reconsider the penalty imposed, an issue which became moot when the Board overturned the decision on the Rule 143.3 violations. We believe that Vicary is entitled to a determination on this point.

## DISPOSITION

The order of the Board is annulled. The matter is remanded to the Board for reconsideration of the penalty imposed.

McKinster J., and Gaut J., concurred.

A petition for a rehearing was denied July 18, 2002, and the petition of real party in interest for review by the Supreme Court was denied October 23, 2002.

---

breast itself for the rule's purposes. We will leave that issue for a case which involves nothing *but* implanted rings and manipulation of the breasts thereby.